# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel* ) <br> BRADLEY NURKIN ) <br><br> **PLAINTIFFS** ) <br> ) <br> **vs.** ) <br> ) <br> HEALTH MANAGEMENT ) <br> ASSOCIATES, INC., CHARLOTTE ) <br> HMA, LLC and PUNTA GORDA HMA, ) <br> LLC ) <br> ) <br> **DEFENDANTS** ) <br> ) | 2: \_11\_-c \_V\_ - \_14\_ -FtM-29DNF <br><br> **CIVIL ACTION NUMBER:**_____ <br><br> **JURY TRIAL DEMANDED** <br><br> •**FILED UNDER SEAL PURSUANT TO** <br> 31 U.S.C. §3730(b)(2) <br><br> •**DO NOT PLACE IN PRESS BOX** <br><br> •**DO NOT ENTER ON PACER** |

JOHN E. STEELE
UNITED STATES DISTRICT JUDGE

DOUGLAS N. FRAZIER
U.S. MAGISTRATE JUDGE

FILED
2011 JAN 14 AM 9: 41
U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS, FLORIDA

## FILED IN CAMERA AND UNDER SEAL

## COMPLAINT AND DEMAND FOR JURY TRIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel* ) <br> BRADLEY NURKIN ) <br> ) <br> **PLAINTIFFS** ) <br> ) <br> **vs.** ) <br> ) <br> HEALTH MANAGEMENT ) <br> ASSOCIATES, INC., CHARLOTTE HMA, ) <br> LLC and PUNTA GORDA HMA, LLC ) <br> ) <br> **DEFENDANTS** ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | **CIVIL ACTION NUMBER:**_____ <br><br> **JURY TRIAL DEMANDED** <br><br> •**FILED UNDER SEAL PURSUANT TO** <br> 31 U.S.C. §3730(b)(2) <br><br><br> •**DO NOT PLACE IN PRESS BOX** <br><br> •**DO NOT ENTER ON PACER** |

*"This is the worst case I have ever seen."*

**Matthew Tormey- National Director of Compliance, Health Management Associates
upon learning of the quid pro quo scheme described herein**

## COMPLAINT AND DEMAND FOR JURY TRIAL

## INTRODUCTION

1.     This is a *qui tam* action brought by Relator Bradley Nurkin, former Chief

Executive Officer of CHARLOTTE REGIONAL MEDICAL CENTER, under the

provision of the Federal Civil False Claims Act, 31 U.S.C. §3729 *et seq.*  The Relator is

suing the defendants named in this Complaint, as set forth in paragraphs 11-13, for treble damages and civil penalties arising from defendants' conduct in violation of the Federal Civil False Claims Act.

2.      As described with particularity herein, Relator Nurkin alleges the defendants named in this Complaint knowingly induced doctors to make patient referrals and hospital admissions by intentionally and knowingly providing the doctors with improper remuneration in violation of the Federal Fraud and Abuse Anti-Kickback and/or the Prohibited Referral Provisions of 42 U.S.C §§1320a-7b and 42 U.S.C §1395nn (hereinafter referred to as the Anti-Kickback Law, and Stark respectively).[1] Furthermore, the defendants named herein violated the Federal Civil False Claims Act, 31 U.S.C §3729, et seq; by intentionally and knowingly submitting false certifications of compliance, and by intentionally and knowingly submitting false UB-92, CMS-1450, CMS-1500 and other claim forms generated as a result of these patient admissions to Medicare, Medicaid, and other government agencies and programs (hereinafter referred to as "Government Healthcare Programs.")

3.      The authority for the filing of this complaint rests in the *qui tam* provisions of the Federal Civil  False Claims Act, 31 U.S.C. §3730(b) which provides that:  "[A] person may bring a civil action for a violation of section 3729 for the person and for the United States Government.  The action shall be brought in the name of the Government."

---

[1] In general, hospitals are prevented from offering any type of remuneration to physicians to encourage referrals to a particular hospital if payment for those patients' procedures comes from Government Healthcare Programs. 42 U.S.C. §1320b(2)(A).

4.      The Federal Civil False Claims Act, Stark, and Anti-Kickback violations contained in this Complaint are based upon false and fraudulent patient claims and hospital cost reports submitted by the defendants from at least 2004 through mid 2007 to Government Healthcare Programs. The defendants knowingly submitted false claims to Government Healthcare Programs in order to cheat the United States of America out of at least **One Hundred Million Dollars ($100,000,000.00) to One Hundred Fifty Million Dollars ($150,000.00).**[2]

## JURISDICTION OF THE UNITED STATES DISTRICT COURT

5.      The United States District Court for the Middle District of Florida has subject matter jurisdiction over this action pursuant to 31 U.S.C. §3730(b) and 28 U.S.C. §1331.

6.      Section 3732(a) of the Federal Civil False Claims Act provides that: "[A]ny action under section 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." Acts proscribed by section 3729 and described in this complaint occurred in Charlotte County, Florida making venue proper in the Fort Meyers Division.

7.      A jury trial is demanded.

---

[2] Financial incentives tied to referrals as described herein corrupt the health care delivery system in ways that harm the Government Healthcare Programs and the beneficiaries.

## PARTIES TO THE COMPLAINT

8.      Bradley Nurkin, the Relator, is a citizen of the United States of America who resides in the State of Tennessee. During the time described in this Complaint, Relator Nurkin was the Chief Executive Officer (CEO) of Defendant, Punta Gorda HMA, LLC, which is known locally and referred to throughout this complaint as CHARLOTTE REGIONAL MEDICAL CENTER.

9.      Relator Nurkin has direct and independent knowledge, pursuant to the meaning and definition of that phrase under 31 U.S.C. § 3730(e)(4)(B), based upon his independent investigation of the facts upon which the allegations set forth in this Complaint are based, and Relator Nurkin is an original source of the facts alleged in this Complaint. [3]

10.     Relator Nurkin's allegations presented in this Complaint and in his written disclosure are not in any way based upon public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a Congressional, administrative, or General Accounting Office report, audit, investigation, or from the news media.

11.     Defendant   Health   Management   Associates,   Inc.   (HEALTH MANAGEMENT ASSOCIATES) is a for profit Delaware corporation with its main office located at 5811 Pelican Bay Boulevard, Suite 500, Naples, Florida 34108-2710. Its

---

[3] Relator Nurkin has provided, pursuant to 31. U.S.C. §3730(b)(2), a written disclosure containing substantially all material evidence and information he possesses to the Attorney General of the United States and to the United States Attorney for the Middle District of Florida.

registered agent for process in the State of Florida is: C T Corporation System, 1200 South Pine Island Road, Plantation, FL 33324.

12.     Defendant Punta Gorda HMA, LLC (CHARLOTTE REGIONAL MEDICAL CENTER) is a hospital located at 809 East Marion Avenue, Punta Gorda, FL. It is a for profit limited liability company organized and existing under the laws of the State of Florida.   Its registered agent for process in the State of Florida is: C T Corporation System, 1200 South Pine Island Road, Plantation, FL 33324.

13.     Defendant Charlotte HMA, LLC (PEACE RIVER REGIONAL MEDICAL CENTER) is a hospital located at 2500 Harbor Boulevard, Port Charlotte, FL 33952. It is a for profit limited liability company organized and existing under the laws of the State of Florida. Its registered agent for process in the State of Florida is: C T Corporation System, 1200 South Pine Island Road, Plantation, FL 33324.

## OVERVIEW OF THIS CASE

14.     Beginning at least in 2004 and continuing through mid 2007 Defendants HEALTH MANAGEMENT ASSOCIATES, CHARLOTTE REGIONAL MEDICAL CENTER, and PEACE RIVER REGIONAL MEDICAL CENTER knowingly and deliberately devised and implemented a scheme to generate, and in fact did generate, patient referrals and admissions to CHARLOTTE REGIONAL MEDICAL CENTER and PEACE RIVER REGIONAL MEDICAL CENTER in direct violation of the Anti-kickback statute and the Stark self-referral prohibitions.

15.     The unlawful scheme described in this Complaint was a *quid pro quo* arrangement.   HEALTH   MANAGEMENT   ASSOCIATES   and   CHARLOTTE

REGIONAL MEDICAL CENTER paid unlawful remuneration amounting to hundreds of thousand of dollars to a physician practice group in North Port, Florida known as PRIMARY CARE ASSOCIATES, and in return the physicians at PRIMARY CARE ASSOCIATES referred and admitted patients to CHARLOTTE REGIONAL MEDICAL CENTER and PEACE RIVER REGIONAL MEDICAL CENTER, both of which are subsidiary hospitals of HEALTH MANAGEMENT ASSSOCIATES.[4]

16.     The improper remuneration provided by HEALTH MANAGEMENT ASSOCIATES and CHARLOTTE REGIONAL MEDICAL CENTER to Primary Care Associates consisted of: free office space, staff, equipment, and direct expense payments of up to approximately $20,000 to $40,000.00 per month from at least 2004 through mid 2007.[5]

17.     The improper remuneration provided by HEALTH MANAGEMENT ASSOCIATES and CHARLOTTE REGIONAL MEDICAL CENTER to PRIMARY CARE ASSOCIATES was knowingly made in order to induce those physicians at PRIMARY CARE ASSOCIATES to make patient referrals and admissions to HEALTH MANAGEMENT ASSOCIATES' hospitals, CHARLOTTE REGIONAL MEDICAL

---

[4] Primary care physicians like those at PRIMARY CARE ASSOCIATES who see a large volume of patients on a daily basis are in a position to generate substantial business for hospitals via referrals and admissions.

[5] Relator Nurkin's investigation located documents evidencing the fraud described herein beginning in 2004. It is verily believed that the improper relationship described in this Complaint existed prior to 2004 and such documents evidencing this relationship should exist.

CENTER and PEACE RIVER REGIONAL MEDICAL CENTER, all in direct violation of the Anti-kickback statute and Stark self referral prohibitions.

18.     During the time referenced in this Complaint (2004 through mid 2007), the medical practice group known as PRIMARY CARE ASSOCIATES was one of the largest admitting practice groups by volume of patients to  CHARLOTTE REGIONAL MEDICAL CENTER and PEACE RIVER REGIONAL MEDICAL CENTER.

19.     During the time referenced in this Complaint (2004 through mid 2007), the revenue generated from the patients admitted and referred to CHARLOTTE REGIONAL MEDICAL CENTER by PRIMARY CARE ASSOCIATES accounted for approximately one-third of the entire revenue for the hospital.  This amount exceeded approximately **Thirty Six Million Dollars ($36,000,000.00)** per year.

20.     During the time referenced in this Complaint (2004 through mid 2007), the revenue generated from the patients admitted and referred to PEACE RIVER REGIONAL MEDICAL CENTER by PRIMARY CARE ASSOCIATES accounted for approximately one-third of the entire revenue for the hospital.  This amount exceeded approximately **Twelve Million Dollars ($12,000,000.00)** per year.

21.     These revenue figures are based on "Gross Charges Report by Physician" which Relator Nurkin was in possession of every month during his tenure as Chief Executive Officer of CHARLOTTE REGIONAL MEDICAL CENTER.

22.     The "Gross Charges Report by Physician" provided an efficient way for the hospital management to determine which physicians were responsible for generating revenue for the hospital and which were not.

23.     Once the illegal conduct as described herein was uncovered by Relator Nurkin, HEALTH MANAGEMENT ASSOCIATES embarked on an elaborate scheme to attempt to justify the improper payments it had made to PRIMARY CARE ASSOCIATES , and simultaneously avoid liability under federal law.

24.     Specifically, HEALTH MANAGEMENT ASSOCIATES' Division 5 President, Joshua Putter, formulated a strategy to:

(1) contrive a defense to invalidate Relator Nurkin's findings regarding HEALTH MANAGEMENT ASSOCIATES' illegal payments to PRIMARY CARE ASSOCIATES, and

(2) with this contrived defense, HEALTH MANAGEMENT ASSOCIATES' strategy, if successful, would maneuver itself away from liability under federal law.

25.     How did Joshua Putter do this? Putter knew PRIMARY CARE ASSOCIATES had little working knowledge of the federal statutes and the negative implications brought about by Relator Nurkin's findings. However, Joshua Putter was well versed with the inner workings of the federal statutes implicated by Relator Nurkin's conclusions. As a result, Joshua Putter took charge of the situation and personally hand wrote two letters *on behalf of* PRIMARY CARE ASSOCIATES, wherein Putter, on behalf of PRIMARY CARE ASSOCIATES, attempted to refute Relator Nurkin's conclusions.[7]

_____

[7] Joshua Putter's actions in creating this situation and in attempting to cover it up by manufacturing letters is *prima facie* evidence of *scienter* - a knowing violation of the federal statutes referenced herein.

26.    The improper remuneration provided by HEALTH MANAGEMENT ASSOCIATES and CHARLOTTE REGIONAL MEDICAL CENTER to the physicians at PRIMARY CARE ASSOCIATES was in direct violation of the Anti-Kickback statute and Stark, both of which are enforceable through the False Claims Act.

27.    The improper remuneration as described in this Complaint that was provided by HEALTH MANAGEMENT ASSOCIATES and CHARLOTTE REGIONAL MEDICAL CENTER to the physicians at PRIMARY CARE ASSOCIATES was designed to influence the medical judgment of those physicians in order to get them to refer and admit patients to CHARLOTTE REGIONAL MEDICAL CENTER and PEACE RIVER REGIONAL MEDICAL CENTER.[8]

28.    As a result of the improper payment referral tactics as described herein, CHARLOTTE REGIONAL MEDICAL CENTER, PEACE RIVER REGIONAL MEDICAL CENTER and HEALTH MANAGEMENT ASSOCIATES obtained patient admissions and referrals to its hospitals that resulted in the defendants knowingly submitting false claims to Government Healthcare Programs with actual knowledge that the claims were false and in violation of both the Anti-kickback statute and Stark.

29.    During the times referenced in this complaint (2004 through mid 2007) the physicians of PRIMARY CARE ASSOCIATES did not have a written contract with CHARLOTTE REGIONAL MEDICAL CENTER, PEACE RIVER REGIONAL MEDICAL CENTER, or HEALTH MANAGEMENT ASSOCIATES for the payments

---

[8] The Anti-Kickback statute is violated where remuneration is tied to referrals even though the referrals may have in fact been for medically necessary services. *U.S. v. Liss*, 265 F.3d 1220 (11th Cir. 2001).

described herein, nor did they have a bona fide employment relationship with CHARLOTTE REGIONAL MEDICAL CENTER, PEACE RIVER REGIONAL MEDICAL CENTER or HEALTH MANAGEMENT ASSOCIATES.

### WHO ALL IS INVOLVED?
### THE CAST OF CHARACTERS

**A.      The Individual Players**

30.      **Bradley Nurkin:** Bradley Nurkin is the Relator. He is the individual responsible for discovering the fraudulent payment referral scheme devised by the Defendants. In December, 2006 he was transferred to HEALTH MANAGEMENT ASSOCIATES' hospital in Punta Gorda, Florida. That hospital is known as CHARLOTTE REGIONAL MEDICAL CENTER. Relator Nurkin served as the Chief Executive Officer (CEO) of the hospital until March 2, 2010 when he was fired by HEALTH MANAGEMENT ASSOCIATES' Division 5 President, Joshua Putter. Relator Nurkin was fired as a direct and proximate result of his "blowing the whistle" on the improper payment referral scheme described in this complaint.

31.      **Michael Zwetschkenbaum**: Michael Zwetschkenbaum was the Chief Financial Officer (CFO) *and* Chief Compliance Officer at CHARLOTTE REGIONAL MEDICAL CENTER in Punta Gorda, Florida. He was already employed as CFO at CHARLOTTE REGIONAL MEDICAL CENTER when Realtor Nurkin arrived in 2006. As Chief Financial Officer, Michael Zwetschkenbaum was responsible for approving payment of all invoices at CHARLOTTE REGIONAL MEDICAL CENTER. He served as the CFO and Chief Compliance Officer for CHARLOTTE REGIONAL MEDICAL CENTER until May 2007 when he was promoted to the position of CFO and Chief

Compliance Officer at Physicians Regional Medical Center in Naples, Florida - another HEALTH MANAGEMENT ASSOCIATES hospital. Zwetschkenbaum now works for a subsidiary hospital of Community Health Systems in Pennsylvania as CFO.

32. **Matthew Tormey**: Matthew Tormey was the National Director of Compliance for HEALTH MANAGEMENT ASSOCIATES at all times described in this complaint. He is an attorney and former member of the Federal Bureau of Investigation. During all times complained of herein, Matthew Tormey was aware of the propensity of HEALTH MANAGEMENT ASSOCIATES to violate the Anti-kickback statutes and Stark. It is his job "to provide oversight, training, and audit support to compliance officers at HMA'S subsidiary hospitals." *United States of America ex rel Ted D. Kosenske, M.D. v. Health Management Associates, et al.* (2010 WL 1390661) p. 3. As of the filing of this Complaint, Matthew Tormey is still serving as the National Director of Compliance for HEALTH MANAGEMENT ASSOCIATES.

33. **Cheryl Tibbett**: Cheryl Tibbett became CFO and Chief Compliance Officer for CHARLOTTE REGIONAL MEDICAL CENTER in the summer of 2007. She replaced Michael Zwetschkenbaum who was promoted to the position of CFO and Chief Compliance Officer at Physicians Regional Medical Center, another HEALTH MANAGEMENT ASSOCIATES' facility. As of the filing of this Complaint Cheryl Tibbett is still serving as the CFO and Chief Compliance Officer for CHARLOTTE REGIONAL MEDICAL CENTER.

34. **Joshua Putter**: Joshua Putter was the CEO of CHARLOTTE REGIONAL MEDICAL CENTER from November 1998 to October 2005[9]. He currently serves as Division 5 President of HEALTH MANAGEMENT ASSOCIATES overseeing eleven hospitals in South Florida including CHARLOTTE REGIONAL MEDICAL CENTER and PEACE RIVER REGIONAL MEDICAL CENTER.

35. **Sarfraz Butt Islam, M.D.**: Sarfraz Butt Islam, M.D. is a primary care physician in Punta Gorda, Florida. At all times described in this complaint there existed a bona fide employment relationship between Dr. Sarfraz Butt Islam and CHARLOTTE REGIONAL MEDICAL CENTER whereby she was paid a full time salary but worked as a part-time contract physician.

36. **Tanweer Memon, M.D.:** Tanweer Memon, M.D. is a primary care physician in Punta Gorda, Florida. At all times described in this complaint he was a member of a physician practice group known as PRIMARY CARE ASSOCIATES, 13035 Tamiami Trail, North Port, FL 34287. At no time mentioned herein did a bona-fide employment relationship ever exist between Dr. Memon and CHARLOTTE REGIONAL MEDICAL CENTER.

B. <u>**The Business Entities**</u>

37. **HEALTH MANAGEMENT ASSOCIATES:** HEALTH MANAGEMENT ASSOCIATES is an operator of acute care, non-urban hospitals in the United States including CHARLOTTE REGIONAL MEDICAL CENTER and PEACE

---

[9] When Putter left the position as CEO of CHARLOTTE REGIONAL MEDICAL CENTER, Dan Buckner became the CEO. Buckner no longer works for HEALTH MANAGEMENT ASSOCIATES.

RIVER REGIONAL MEDICAL CENTER. The actions of the employees and agents of HEALTH MANAGEMENT ASSOCIATES as described herein were within the scope of their employment. The policies and practices alleged in this complaint were set or ratified at the highest corporate levels of HEALTH MANAGEMENT ASSOCIATES.

38. **PUNTA GORDA HMA, LLC:** Punta Gorda HMA, LLC is a hospital located in Punta Gorda, Florida and is commonly known as CHARLOTTE REGIONAL MEDICAL CENTER.

39. **CHARLOTTE HMA, LLC:** Charlotte HMA, LLC is a hospital located in Port Charlotte, FL and is commonly known as PEACE RIVER REGIONAL MEDICAL CENTER.

40. **PRIMARY CARE ASSOCIATES:** PRIMARY CARE ASSOCIATES is physician practice group located at 13035 Tamiami Trail, North Port, FL 34287. At all times described in this Complaint Tanweer Memon, M.D. was a member of PRIMARY CARE ASSOCIATES.

## DETAILS OF THE FRAUDULENT SCHEME

### A. Discovery Of The Expense Reports From PRIMARY CARE ASSOCIATES

41. In the summer of 2007, within weeks of beginning her job as CFO and Chief Compliance Officer at CHARLOTTE REGIONAL MEDICAL CENTER, Cheryl Tibbett received an invoice in excess of $20,000 from PRIMARY CARE ASSOCIATES. The invoice represented one month of expenses for PRIMARY CARE ASSOCIATES.

42. The invoice, which was to be paid directly to PRIMARY CARE ASSOCIATES, was labeled as monthly overhead expenses for Dr. Sarfraz Butt Islam's practice.

43. CFO Tibbett discovered, after investigating, that Dr. Sarfraz Butt Islam was a contract (part-time) employee of CHARLOTTE REGIONAL MEDICAL CENTER, and was not an employee of PRIMARY CARE ASSOCIATES. In other words there existed a bona fide employment relationship between Dr. Sarfraz Butt Islam and CHARLOTTE REGIONAL MEDICAL CENTER.

44. As an experienced CFO, Tibbett knew that monthly overhead expenses of $20,000 for a part-time primary care physician were excessive.

45. It was puzzling to CFO Tibbett why CHARLOTTE REGIONAL MEDICAL CENTER should reimburse PRIMARY CARE ASSOCIATES for Dr. Sarfraz Butt Islam's expenses, since Dr. Sarfraz Butt Islam worked for CHARLOTTE REGIONAL MEDICAL CENTER, not PRIMARY CARE ASSOCIATES.

46. CFO Tibbett could not locate a written agreement or contract (and indeed there never was such a written agreement or contract) between PRIMARY CARE ASSOCIATES and CHARLOTTE REGIONAL MEDICAL CENTER on which this invoice was even predicated.

**B.** **CFO Tibbett Asks Relator Nurkin What He Knows About The Invoice**

47.   CFO Tibbett immediately asked Relator Nurkin, Chief Executive Officer of the hospital, what, if anything, he knew about the invoice from PRIMARY CARE ASSOCIATES.[10]

48.   Relator Nurkin was also baffled why PRIMARY CARE ASSOCIATES submitted the invoice to the hospital for payment since there was no written agreement or contract between CHARLOTTE REGIONAL MEDICAL CENTER, HEALTH MANAGEMENT ASSOCIATES and PRIMARY CARE ASSOCIATES on which to base the invoice, nor was there a bona fide employment relationship between CHARLOTTE REGIONAL MEDICAL CENTER, HEALTH MANAGEMENT ASSOCIATES and PRIMARY CARE ASSOCIATES.

49.   Relator Nurkin reviewed the invoice and, like CFO Tibbett, was also of the opinion that $20,000 in monthly expenses for Dr. Sarfraz Butt Islam, a part-time contract employee of CHARLOTTE REGIONAL MEDICAL CENTER, was out of the ordinary, and furthermore there was no reason at all for CHARLOTTE REGIONAL MEDICAL CENTER to be making any payments to PRIMARY CARE ASSOCIATES.

**C.   Relator Nurkin Uncovers A Fraudulent Payment For Patients Scheme**

50.   Relator Nurkin's independent analysis conducted as CEO of CHARLOTTE REGIONAL MEDICAL CENTER revealed that for the period of time

---

[10] At this point it should be noted that Relator Nurkin had been on the job as CEO for several months at CHARLOTTE REGIONAL MEDICAL CENTER while Michael Zwetschkenbaum was the CFO and Chief Compliance Officer. The first time Relator Nurkin learned about the payments to PRIMARY CARE ASSOCIATES was when Cheryl Tibbett became CFO and Chief Compliance Officer and Zwetschkenbaum was promoted to another HEALTH MANAGEMENT ASSOCIATES hospital. See, paragraph 31.

beginning <u>at least</u> in 2004 and (presumably) ending in mid 2007, monthly invoices for expense reimbursements from PRIMARY CARE ASSOCIATES were approved and paid by CHARLOTTE REGIONAL MEDICAL CENTER under the direction of then CFO, Michael Zwetschkenbaum.

51.     Relator Nurkin discovered that PRIMARY CARE ASSOCIATES would deliver its monthly invoice to the CFO at CHARLOTTE REGIONAL MEDICAL CENTER, Michael Zwetschkenbaum. Zwetschkenbaum would in turn hand write on the invoice "OK To Pay" and the invoice was paid.

52.     During his independent investigation Relator Nurkin located the previous invoices submitted from PRIMARY CARE ASSOCIATES. However, unlike other expense files, the invoices from PRIMARY CARE ASSOCIATES were kept in separate boxes (in prior CFO) Michael Zwetschkenbaum's office.

53.     Because there was <u>no written agreement or contract</u> on which to base these invoices, and since PRIMARY CARE ASSOCIATES was one of the largest admitting practice groups by volume of patients to CHARLOTTE REGIONAL MEDICAL CENTER *and* PEACE RIVER REGIONAL MEDICAL CENTER Relator Nurkin knew that paying these invoices amounted to improper remuneration to PRIMARY CARE ASSOCIATES and thus was a violation of the Anti-kickback statute and Stark regulations.

D.     <u>Relator Nurkin Reports The Fraud To HMA's National Director Of
Compliance</u>

54.     Realizing the obvious compliance problems presented by years of improper payments to PRIMARY CARE ASSOCIATES and pursuant to his obligations under the HEALTH MANAGEMENT ASSOCIATES Compliance Program and the Code of Conduct, Relator Nurkin alerted Matthew Tormey, National Director of Compliance for HEALTH MANAGEMENT ASSOCIATES of his findings. Matthew Tormey works out of HEALTH MANAGEMENT ASSOCIATES' main office in Naples, Florida.

55.     Matthew Tormey instructed Relator Nurkin to continue to fully investigate the matter and see what else he could uncover concerning the relationship between CHARLOTTE REGIONAL MEDICAL CENTER, HEALTH MANAGEMENT ASSOCIATES, and PRIMARY CARE ASSOCIATES.

56.     Matthew Tormey instructed Relator Nurkin to immediately stop paying PRIMARY CARE ASSOCIATES' invoices as he too deemed them to be improper and in violation of the Anti-kickback Statute and Stark.

### E.     These Expenses Are Not For Dr. Islam....They Are For PRIMARY CARE ASSOCIATES

57.     Relator Nurkin continued researching the matter as directed by Matthew Tormey, the National Director of Compliance for HEALTH MANAGEMENT ASSOCIATES. What Relator Nurkin unearthed was a fraudulent "payment for patients" scheme, operational since at least 2004.

58.     Under the scheme, CHARLOTTE REGIONAL MEDICAL CENTER and HEALTH MANAGEMENT ASSOCIATES knowingly circumvented the Anti-Kickback Statute and Stark laws by:

- intentionally and fraudulently allowing PRIMARY CARE ASSOCIATES to operate rent free out of Dr. Sarfraz Butt Islam's office[11], in order to induce PRIMARY CARE ASSOCIATES to refer and admit patients to CHARLOTTE REGIONAL MEDICAL CENTER and PEACE RIVER REGIONAL MEDICAL CENTER, and

- intentionally and fraudulently paying PRIMARY CARE ASSOCIATES' expenses for staff, equipment, supplies, advertisements, billing, collection services and other expenses, in order to induce PRIMARY CARE ASSOCIATES to refer and admit patients to CHARLOTTE REGIONAL MEDICAL CENTER and PEACE RIVER REGIONAL MEDICAL CENTER, and

- intentionally and fraudulently disguising PRIMARY CARE ASSOCIATES' expenses as being expenses for Dr. Sarfraz Butt Islam, when such was not the case[12], and

- knowingly submitting false claims for these patient referrals and admissions to Government Healthcare Programs.

59.     As part of his investigation, Relator Nurkin was instructed by Matthew Tormey to *assume* that a written agreement or contract had been in place between CHARLOTTTE REGIONAL MEDICAL CENTER and PRIMARY CARE ASSOCIATES whereby CHARLOTTE REGIONAL MEDICAL CENTER agreed to provide free office space and the other aforementioned benefits to PRIMARY CARE ASSOCIATES.   Relator Nurkin was then instructed to calculate the absolute lowest

---

[11] As a bona fide employee of CHARLOTTE REGIONAL MEDICAL CENTER, Dr. Sarfraz Butt Islam was provided with office space by the hospital.

[12] The reason the expenses for PRIMARY CARE ASSOCIATES were disguised as being for Dr. Sarfraz Butt Islam is due to an exception in the Anti-Kickback Statute, 42 U.S.C.§1320(b)(3)(B) which provides that "...any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services..." is not considered a kickback.

dollar value of those benefits that PRIMARY CARE ASSOCIATES had received directly from CHARLOTTE REGIONAL MEDICAL CENTER and which PRIMARY CARE ASSOCIATES could, with a straight face, be asked to repay. The purpose of this exercise was to reduce the amount of dollars which PRIMARY CARE ASSOCIATES received thus, in effect, trivializing the fraudulent violations committed by HEALTH MANAGEMENT ASSOCIATES and CHARLOTTE REGIONAL MEDICAL CENTER.

60.     Relator Nurkin analyzed the issue using the parameters established by Matthew Tormey, HEALTH MANAGEMENT ASSOCIATES' National Director of Compliance.

61.     Relator Nurkin determined that, unlike Dr. Sarfraz Butt Islam who only worked part-time in her practice, the physicians at PRIMARY CARE ASSOCIATES maintained a very active full-time practice.

62.     In fact, Relator Nurkin discovered that from 2004 to mid 2007 PRIMARY CARE ASSOCIATES was one of the largest admitting practice groups by volume of patients to CHARLOTTE REGIONAL MEDICAL CENTER *and* PEACE RIVER REGIONAL MEDICAL CENTER.

63.     Relator Nurkin ultimately determined that while the actual dollar amount of the benefits PRIMARY CARE ASSOCIATES had received from HEALTH MANAGEMENT ASSOCIATES and CHARLOTTE REGIONAL MEDICAL CENTER during the course of this scheme was approximately $500,000-$800,000 the absolute lowest dollar amount that could reasonably be justified pursuant to the parameters set by

HEALTH MANAGEMENT ASSOCIATES' National Director of Compliance was $120,000. Relator Nurkin's findings were included in a written report.

**F.     Matthew Tormey: "This is the worst case I have ever seen."**

64.     Relator Nurkin once again contacted Matthew Tormey, the National Director of Compliance for HEALTH MANAGEMENT ASSOCIATES, and reported the completed results of his internal investigation and accounting. [13]

65.     Relator Nurkin explained to Matthew Tormey that Dr. Sarfraz Butt Islam was a bona fide employee of CHARLOTTE REGIONAL MEDICAL CENTER working as a contract physician. However it was patently obvious that from 2004 through mid 2007 CHARLOTTE REGIONAL MEDICAL CENTER and HEALTH MANAGEMENT ASSOCIATES had paid at least $500,000-$800,000 in illegal expenses for PRIMARY CARE ASSOCIATES that were intentionally and fraudulently classified as being for Dr. Sarfraz Butt Islam.  Relator Nurkin told Matthew Tormey that of the $500,000-$800,000 that had been paid to PRIMARY CARE ASSOCIATES, $120,000 was the lowest dollar amount that could reasonably be justified.

66.     After Relator Nurkin finished explaining the fraudulent expense payment scheme to Matthew Tormey and the amount of money involved, Tormey replied, "This is the worst case I have ever seen."

**G.     Health Management Associates Hatches A Plan To Turn These Fraudulent Payments Into A Mere Business Dispute With PRIMARY CARE ASSOCIATES**

---

[13] A copy of Relator Nurkin's written report was provided to Matthew Tormey and should be in the possession of HEALTH MANAGEMENT ASSOCIATES.

67.    After learning of the magnitude of the problem from Relator Nurkin, Matthew Tormey convened a conference call to discuss these illegal payments. The following individuals were present on the call:

- Matthew Tormey- National Director of Compliance for HEALTH MANAGEMENT ASSOCIATES
- Joshua Putter- Division 5 President of  HEALTH MANAGEMENT ASSOCIATES
- Relator Nurkin- CEO of CHARLOTTE REGIONAL MEDICAL CENTER
- Cheryl Tibbett- CFO and Chief Compliance Officer of CHARLOTTE REGIONAL MEDICAL CENTER
- Outside counsel whose identity is not known at this time.

68.    During the conference call, the substance of Relator Nurkin's report was shared to the participants on the call.

69.    A decision was made during this conference call that Relator Nurkin should  demand that PRIMARY CARE ASSOCIATES repay the artificially deflated amount- $120,000 -to CHARLOTTE REGIONAL MEDICAL CENTER.

70.    Relator verily believes the purpose of this conference call was to create the impression that HEALTH MANAGEMENT ASSOCIATES and CHARLOTTE REGIONAL MEDICAL CENTER were taking this compliance issue seriously, and actually wanted to recover this money from PRIMARY CARE ASSOCIATES.

71.    However, the fact of the matter was that Joshua Putter, Division 5 President of HEALTH MANAGEMENT ASSOCIATES had no intention of collecting any money from PRIMARY CARE ASSOCIATES.

72.    The absolute last thing that HEALTH MANAGEMENT ASSOCIATES or CHARLOTTE REGIONAL MEDICAL CENTER wanted to do was disturb the

profitable, yet illegal, patient referral relationship with PRIMARY CARE ASSOCIATES by demanding those physicians refund any amount of money to CHARLOTTE REGIONAL MEDICAL CENTER.

73. During the conference call Matthew Tormey, the National Director of Compliance for HEALTH MANAGEMENT ASSOCIATES, told Relator Nurkin to go see the contact person at PRIMARY CARE ASSOCIATES (that person was Dr. Memon) show him the analysis, and demand repayment of $120,000.00.

74. Matthew Tormey provided Relator Nurkin with a demand letter to submit to Dr. Memon requesting repayment of $120,000.

**H.    Relator Nurkin Meets With Dr. Tanweer Memon And Demands Repayment**

75. Relator Nurkin signed the demand letter and, as instructed, met with Dr. Memon of PRIMARY CARE ASSOCIATES.

76. Relator Nurkin explained three things to Dr. Memon:

- CHARLOTTE REGIONAL MEDICAL CENTER and HEALTH MANAGEMENT ASSOCIATES would no longer pay the monthly expenses of PRIMARY CARE ASSOCIATES;

- HEALTH MANAGEMENT ASSOCIATES and CHARLOTTE REGIONAL MEDICAL CENTER demanded repayment of $120,000.00 for past expense payments made to PRIMARY CARE ASSOCIATES as those payments were illegal and in violation of federal law; and

- get a lawyer.

77. Dr. Memon responded to Relator Nurkin by saying, "I will go talk to Josh Putter."

**I.   Whose Side is Joshua Putter On?  Joshua Putter Prepares Dr. Memon's Response To The $120,000 Demand Letter...The Creation Of Joshua Letter No. 1**

78.   Shortly after Relator Nurkin's visit with Dr. Memon, Joshua Putter, Division 5 President of HEALTH MANAGEMENT ASSOCIATES, traveled from corporate headquarters in Naples, Florida to personally see Relator Nurkin at CHARLOTTE REGIONAL MEDICAL CENTER in Punta Gorda, Florida.

79.   While in Relator Nurkin's office and in the presence of Relator Nurkin, Joshua Putter, Division 5 President of HEALTH MANAGEMENT ASSOCIATES, prepared Dr. Memon's response to the $120,000 demand letter that Relator Nurkin previously delivered to Dr. Memon.

80.   The letter, referred to in this Complaint as Joshua Letter No. 1, is the first of two letters authored by Joshua Putter of HEALTH MANAGEMENT ASSOCIATES for Dr. Memon of PRIMARY CARE ASSOCIATES.

81.   Joshua Letter No. 1 was physically typed by Relator Nurkin's secretary, Kamela Robbins, at CHARLOTTE REGIONAL MEDICAL CENTER and printed on PRIMARY CARE ASSOCIATES' letterhead obtained by HEALTH MANAGEMENT ASSOCIATES Division 5 President, Joshua Putter.

82.   A copy of Joshua Letter No. 1, handwritten by Joshua Putter, is attached as Exhibit A to this Complaint.[15]

Joshua Letter No. 1 reads as follows:

*Dear Mr. Nurkin:*

*Re: Expenses Associated With*
  *Dr. Islam Practice* **[Dr. Sarfraz Butt Islam]**

*I want to thank you and Mr. Putter for taking the time to discuss with me the analysis of Dr. Butt's* **[Dr. Sarfraz Butt Islam]** *practice which included her revenue and expenses and the assertion that PRIMARY CARE ASSOCIATES owes monies to Charlotte Regional Medical Center. The following is my analysis of and response to the report.*

*The report analyzed the expenses associated with Dr.* **[Sarfraz Butt]** *Islam's practice. In every category of expense which included salary, billing & collections, benefits, etc., the accountant concluded that "the operating expenses on a combined basis (excluding physician salary and capital expenses) the costs incurred on behalf of the physician are considered <u>reasonable and necessary</u> for a doctor working a full time schedule." I agree completely with this analysis. The hospital asked PRIMARY CARE ASSOCIATES to manage the expenses associated with Dr.* **[Sarfraz Butt]** *Islam's practice. We billed the hospital monthly and were paid according to the invoice.* **[illegible writing]** *If the hospital had a question on the invoice, they were appropriately answered and the invoice was paid. <u>AT NO TIME DID THE HOSPITAL COMMUNICATE THAT THE EXPENSES WERE INAPPROPRIATE.</u>*

*The second part of the letter addressed what a "full time" physician should maintain with respect to a patient volume. The accountant felt that "primary care practices which have been established 12-18 months should be able to maintain a daily visit volume of 25 patients, even up to 40 on the high end." I would not agree nor disagree with that assertion. Practices see less or more depending on the person. However, at no time did the hospital ask PRIMARY CARE ASSOCIATES to manage Dr.* **[Sarfraz Butt]** *Islam or the volume of patients she saw. In fact, in discussions with other hospital employed primary care doctors, they routinely see fewer than 25 patients, even in season. Regardless, PRIMARY CARE ASSOCIATES was never responsible for managing Dr.* **[Sarfraz Butt]** *Islam's volumes.*

---

[15] The typed version of Joshua Letter No. 1 is in the possession of either HEALTH MANAGEMENT ASSOCIATES or CHARLOTTE REGIONAL MEDICAL CENTER.

*Thirdly, the consultant felt that Dr. [Sarfraz Butt] Islam's expenses were overstated due to her volumes. Irrespective of that the expenses were deemed reasonable. Due to this "arbitrary" volume expectations, the consultant concludes that PRIMARY CARE ASSOCIATES owes the hospital $120,000 for excess expense payments. We totally and unconditionally reject this argument. At no time did the hospital raise the issue of excess expenses payments and the expenses were reasonable and necessary.*

*Finally, the hospital failed to pay the invoices for August and September 2007. This amount totaled $48,034.84. PRIMARY CARE ASSOCIATES does owe rent in the amount of $13,734.98 for the time that we rented space in Dr. [Sarfraz Butt] Islam's office. The net amount owed to PRIMARY CARE ASSOCIATES is $34,299.86. In order to come to a resolution and close this issue, PRIMARY CARE ASSOCIATES would be willing to settle this matter for the amount owed to our practice despite the fact no additional costs were [illegible writing] while PRIMARY CARE ASSOCIATES leased this office space.*

*I await your reply*

*Sincerely,*

*Tanweer Memon, M.D.*

83.     After the letter was typed and printed (on PRIMARY CARE ASSOCIATES' letterhead) by Kamela Robbins, Joshua Putter took the letter with him and left Relator Nurkin's office.

84.     Joshua Putter obtained Dr. Memon's signature on Joshua Letter No. 1, and the signed letter was transmitted back to Relator Nurkin. Relator Nurkin then sent it on to Matthew Tormey, the National Director of Compliance for HEALTH MANAGEMENT ASSOCIATES.

85.     Thereafter Matthew Tormey prepared a second demand letter on behalf of HEALTH MANAGEMENT ASSOCIATES which Relator Nurkin signed and sent to Dr. Memon.

- 26 -

86.     On October 27, 2008[16], Relator Nurkin hand delivered this second demand letter to Dr. Memon at PRIMARY CARE ASSOCIATES.

87.     In this letter, HEALTH MANAGEMENT ASSOCIATES again demanded repayment of $120,000 in improper payments made by them and CHARLOTTE REGIONAL MEDICAL CENTER to PRIMARY CARE ASSOCIATES.

### J.     Joshua Putter Prepares *Another Response* for Dr. Memon; Joshua Letter No. 2

88.     In November 2008, HEALTH MANAGEMENT ASSOCIATES Division 5 President Joshua Putter again traveled from HEALTH MANAGEMENT ASSOCIATES' headquarters in Naples to visit Relator Nurkin in his office at CHARLOTTE REGIONAL MEDICAL CENTER in Punta Gorda, FL.

89.     Division 5 President Joshua Putter explained to Relator Nurkin that the patient referrals from Dr. Memon and the physicians at PRIMARY CARE ASSOCIATES were financially important to CHARLOTTE REGIONAL MEDICAL CENTER, PEACE RIVER REGIONAL MEDICAL CENTER, and HEALTH MANAGEMENT ASSOCIATES.

90.     Joshua Putter stressed to Relator Nurkin that the relationship with PRIMARY CARE ASSOCIATES must be preserved at all costs, as this group of physicians was responsible for a tremendous amount of patient referrals and admissions to CHARLOTTE REGIONAL MEDICAL CENTER and PEACE RIVER REGIONAL

---

[16] Relator Nurkin does not have a copy of the October 27, 2008 letter to PRIMARY CARE ASSOCIATES. However, the letter should have been retained by CHARLOTTE REGIONAL MEDICAL CENTER and HEALTH MANAGEMENT ASSOCIATES as the letter was sent in the normal course of business.

MEDICAL CENTER that resulted in millions of dollars in billings to Government Healthcare Programs.

91.     Joshua Putter made it clear to Relator Nurkin that the monthly expenses of Dr. Memon and his partners at PRIMARY CARE ASSOCIATES were paid by CHARLOTTE REGIONAL MEDICAL CENTER and HEALTH MANAGEMENT ASSOCIATES in order to induce referrals to HEALTH MANAGEMENT ASSOCIATES' hospitals.[17]

92.     Joshua Putter explicitly declared to Relator Nurkin that pushing this issue any further with Dr. Memon would likely cause Dr. Memon and the other physicians at PRIMARY CARE ASSOCIATES to admit and refer patients to competing hospitals in South Florida, thus negatively impacting CHARLOTTE REGIONAL MEDICAL CENTER, PEACE RIVER REGIONAL MEDICAL CENTER, and HEALTH MANAGEMENT ASSOCIATES with respect to billing Government Healthcare Programs.

93.     While in Relator Nurkin's office and in the presence of Relator Nurkin, Joshua Putter once again prepared a response for Dr. Memon, this time in response to HEALTH MANAGEMENT ASSOCIATES' second demand letter of October 27, 2008.

94.     This letter authored by Joshua Putter is known as Joshua Letter No. 2.

---

[17] A violation of the Anti-Kickback statute exists where a hospital "provides physicians with services for free or less than fair market value, or relieves physicians of financial obligations they would otherwise incur." 70 *Federal Register* 4858, 4866 (January 31, 2005).

95.     A copy of Joshua Letter No. 2 (the version handwritten by Joshua Putter) is attached as Exhibit B to this Complaint.[18]

96.     Joshua Letter No. 2 was also typed by Relator Nurkin's secretary, Kamela Robbins, at CHARLOTTE REGIONAL MEDICAL CENTER and printed on PRIMARY CARE ASSOCIATES' letterhead obtained by Joshua Putter.

97.     Joshua Letter No. 2, is the second of two letters authored by Joshua Putter of HEALTH MANAGEMENT ASSOCIATES on behalf of Dr. Memon and PRIMARY CARE ASSOCIATES.

98.     Joshua Letter No. 2 reads verbatim:

*Dear Bradley:*

*I have received your letter dated October 27, 2008. I now wish to resolve this issue fairly and amicably.*

*The point of your letter now revolves around our use of the ~~employees~~ staff and supplies while we were in the offices. ~~Although we did practice.~~ Although we did utilize the space during the time that Dr.* **[Sarfraz Butt]** *Islam was in a full time practice, we did so on a limited basis. In addition, ~~we did not utilize~~ we dispute $120,000 worth "of staff and supplies as you put forth in your letter.*

*I still maintain that we managed her ~~staff~~ practice as directed by Charlotte Regional Medical Center & that you still are indebted to PRIMARY CARE ASSOCIATES for $48,034.84. We have no intention of "reimbursing" you for your expenses that we feel we did not utilize.*

*This is our final ~~correspondence~~ letter on this subject and we fully expect this matter to be closed.*

---

[18]  The typed version of this letter is in the possession of either HEALTH MANAGEMENT ASSOCIATES or CHARLOTTE REGIONAL MEDICAL CENTER.

99.     After Kamela Robbins (Relator Nurkin's secretary) typed and printed the letter on PRIMARY CARE ASSOCIATES' letterhead, Joshua Putter took the letter with him and obtained Dr. Memon's signature.

100.    The letter was then transmitted back to Relator Nurkin.

101.    Relator Nurkin received the letter and immediately scanned it to Matthew Tormey, National Director of Compliance for HEALTH MANAGEMENT ASSOCIATES.[19]

## K.     Matthew Tormey Convenes Another Conference Call; The Matter Is Dropped

102.    After receiving Joshua Letter No. 2 from Relator Nurkin, Matthew Tormey convened yet another conference call to discuss the situation surrounding PRIMARY CARE ASSOCIATES.

103.    This call occurred in late 2008. The following individuals were present on the call:

- Matthew Tormey- HEALTH MANAGEMENT ASSOCIATES National Director of Compliance
- Joshua Putter- HEALTH MANAGEMENT ASSOCIATES Division 5 President
- Relator Nurkin- CEO of CHARLOTTE REGIONAL MEDICAL CENTER
- Cheryl Tibbett- CFO and Chief Compliance Officer of CHARLOTTE REGIONAL MEDICAL CENTER
- Outside counsel whose identity is not known at this time.

---

[19] A copy of this letter should be in the possession of either CHARLOTTE REGIONAL MEDICAL CENTER or HEALTH MANAGEMENT ASSOCIATES.

104.    The stated purpose of this conference call was to decide what, if anything, to ultimately do about the illegal payments made to PRIMARY CARE ASSOCIATES by HEALTH MANAGEMENT ASSOCIATES and CHARLOTTE REGIONAL MEDICAL CENTER in light of Dr. Meemon's "responses" as contained in Joshua Letters 1 and 2.

105.    On this conference call the officials from HEALTH MANAGEMENT ASSOCIATES and CHARLOTTE REGIONAL MEDICAL CENTER discussed the concocted facts as presented by HEALTH MANAGEMENT ASSOCIATES - which were presented in a business litigation analysis and not a compliance analysis.

106.    HEALTH MANAGEMENT ASSOCIATES concluded it would be too costly to litigate this dispute with PRIMARY CARE ASSOCIATES in light of the position taken by Dr. Meemon as contained in Joshua Letter Nos. 1 and 2.

107.    At no time during this conference call did Joshua Putter reveal that he had, in fact, authored the two letters signed by Dr. Memon.

108.    Relator Nurkin was told not to take any further action regarding PRIMARY CARE ASSOCIATES, the matter was to be dropped, and the conference call was concluded.

**L.       Relator Nurkin Knows His Days Are Numbered**

109.    After his discovery of this illegal scheme and cover-up Relator Nurkin knew that his career at HEALTH MANAGEMENT ASSOCIATES had come to an end.

110.    Although Relator Nurkin continued to work diligently in his capacity as Chief Executive Officer of CHARLOTTE REGIONAL MEDICAL CENTER, he was wrongfully fired by Joshua Putter on March 2, 2010.

111.   Joshua Putter stated the reason Relator Nurkin was fired was for "poor physician relations".   However, prior to his improper firing by CHARLOTTE REGIONAL MEDICAL CENTER and HEALTH MANAGEMENT ASSOCIATES, Relator Nurkin received 100% of his bonus which was completely results driven.

112.   Relator Nurkin was fired by HEALTH MANAGEMENT ASSOCIATES and CHARLOTTE REGIONAL MEDICAL CENTER because of lawful acts done by him to prevent unlawful payments being made to PRIMARY CARE ASSOCIATES in violation of the Anti-Kickback statute and Stark.

113.   Relator Nurkin now works for Mountain States Health Alliance as the President  & Chief Executive Officer of Johnson City Medical Center in Johnson City, TN.

**M.**   **Liability Under The Anti-Kickback Statute**

114.   The facts presented in this Complaint demonstrate clearly and convincingly that the payments for patients scheme between HEALTH MANAGEMENT ASSOCIATES, CHARLOTTE REGIONAL MEDICAL CENTER and the physicians at PRIMARY CARE ASSOCIATES constituted illegal remuneration under the Anti-Kickback Statute as found in 42 U.S.C §1320a-7b(b). In pertinent part the statute states:

> Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, ... shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

115.    The remuneration provided to PRIMARY CARE ASSOCIATES by CHARLOTTE REGIONAL MEDICAL CENTER consisted of providing them with free office space, and paying their monthly expenses of approximately $20,000 per month from at least 2004-mid 2007.  These benefits were knowingly provided to PRIMARY CARE ASSOCIATES to induce the physicians at PRIMARY CARE ASSOCIATES to refer patients to CHARLOTTE REGIONAL MEDICAL CENTER and PEACE RIVER REGIONAL MEDICAL CENTER, in knowing violation of the Anti-Kickback Statute.

**N.      Liability Under Stark**

116.    Stark prohibits physician referrals to facilities with which the physician has a financial relationship. 42.U.S.C. §1395nn(a)(1) provides in pertinent part:

> if a physician (or an immediate family member of
> such physician) has a financial relationship with an entity
> specified in paragraph (2), then (A) the physician may
> not make a referral to the entity for the furnishing of
> designated health services for which payment otherwise
> may be made under this subchapter, and (B) the entity may
> not present or cause to be presented a claim under this
> subchapter or bill to any individual, third party payor, or
> other entity for designated health services furnished
> pursuant to a referral prohibited under subparagraph (A).

117.    Under Stark, a physician has a "financial relationship" with an entity if it has a "compensation arrangement" with it.  42.U.S.C. §1395nn(a)(2). A compensation arrangement consists of "any arrangement involving any remuneration between a physician... and an entity..." 42.U.S.C. §1395nn(h)(1)(A). "The term 'remuneration' includes any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. §1395nn(h)(1)(B).

118. The arrangement between PRIMARY CARE ASSOCIATES and CHARLOTTE REGIONAL MEDICAL CENTER described herein constitutes a financial relationship per the Stark Act.

119. Liability under Stark involves three elements: (1) a physician refers a patient to an entity for a designated health service; (2) the physician and the entity have a financial relationship; (3) none of the Stark exceptions apply. Each of these three elements is met in this case.[20]

120. The knowing submission of fraudulent claims to Government Healthcare Programs in violation of the Stark Law gives rise to False Claims Act liability on the part of HEALTH MANAGEMENT ASSOCIATES, CHARLOTTE REGIONAL MEDICAL CENTER, and PEACE RIVER REGIONAL MEDICAL CENTER.

121. Every UB-92, CMS-1450, CMS-1500 and other claim forms submitted to Government Healthcare Programs by the defendants named herein for services rendered to patients who were unlawfully referred to CHARLOTTE REGIONAL MEDICAL CENTER and PEACE RIVER REGIONAL MEDICAL CENTER by PRIMARY CARE ASSOCIATES in violation of the Stark Law and/or Anti-Kickback law pursuant to the scheme described herein are false.

### Damages Under The False Claims Act

122. The Federal False Claims Act, 31 U.S.C. §3729 et seq. provides in pertinent part that:

---

[20] Stark outlines certain financial arrangement between hospitals and physicians that are not prohibited. However, none of those exceptions are relevant in this case. The exceptions are found in 42 U.S.C. §1395nn(e)(3)(A).

(a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government;

***

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.

123.   The Relator, on behalf of the United States of America, requests treble damages and penalties, pursuant to the False Claims Act, against the defendants named herein for knowingly and intentionally causing false claims, including but not limited to UB-92, CMS-1450, and CMS-1500 forms to be submitted to Government Healthcare Programs for the sole purpose of stealing millions of dollars from the United States of America.

WHEREFORE, PREMISES CONSIDERED, Relator respectfully requests this Court to enter a judgment against the defendants herein as follows:

- That the United States of America be awarded damages in the amount of three times the damages sustained by the United States of America because of the false claims alleged within this Complaint, as the Federal Civil False Claims Act, 31 U.S.C. §3729 et seq. provides;

- That civil penalties of $11,000 be imposed for each and every false claim that the defendants caused to presented to Government Healthcare Programs;

- That pre and post-judgment interest be awarded, along with reasonable attorney's fees, costs, expenses which the Relator necessarily incurred in bringing and pursuing this case;

- That the Relator be awarded the maximum amount allowed pursuant to the False Claims Act, and any other applicable statutes;

- That this Court award such other and further relief as it deems proper.

RESPECTFULLY SUBMITTED,
Robert Branning, Trial Counsel


Robert Branning, Attorney
Florida Bar No. 189367
1411 Bayview Court
Fort Myers, FL  33901
Telephone: (239) 461-0010
Fax:        (239) 461-0012
Email: branninglaw@yahoo.com


**OF COUNSEL:**
Edward Sanders* MS Bar No. 8880
Sanders Law Office
356 Highway 51; Suite A
Ridgeland, MS  39157
Telephone: 601-622-5477
Email: edwardlloydsanders@gmail.com
*Special Admission To Practice Pursuant
To Local Rule 2.02 Pending

## CERTIFICATE OF SERVICE

The undersigned certifies that on the _____14_____ day of January 2011, a copy of the foregoing Complaint was **hand delivered** to the Office of the **United States Attorney for the Middle District of Florida**, 400 N. Tampa Street, Suite 3200, Tampa, FL 33602.

The undersigned certifies that on the _____14_____ day of January 2011, a copy of the foregoing Complaint was mailed via certified U.S. mail to **Honorable Eric Holder**, United States Attorney General, U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, D.C. 20530-0001.

Robert Branning, Attorney
Florida Bar No. 189367
1411 Bayview Court
Fort Myers, FL 33901
Telephone: (239) 461-0010
Fax:          (239) 461-0012
Email: branninglaw@yahoo.com