UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA, ex
rel and BRADLEY NURKIN,

      Plaintiffs,

v.                                  Case No: 2:11-cv-14-FtM-29MRM

HEALTH              MANAGEMENT
ASSOCIATES, INC., CHARLOTTE
HMS, LLC, and PUNTA GORDA
HMA, LLC,

      Defendants.

_____

## OPINION AND ORDER

This matter comes before the Court on Relator's Motion for Award of Attorney Fees, Costs, and Expenses (Doc. #12) and his Memorandum in Support (Doc. #13), both filed on May 4, 2020. Defendants filed an Opposition (Doc. #24) on May 18, 2020, to which Relator filed a Reply (Doc. #26) on June 3, 2020. The parties participated in a settlement conference with the assigned magistrate judge, but were unable to resolve the motion. (Docs. #27, 33.) For the reasons set forth below, the motion is granted to the extent that attorney fees, costs, and expenses are awarded, but denied in part as to the amounts requested.

**I.**

The False Claims Act (FCA), 31 U.S.C. §§ 3729-3733, imposes civil liability on persons who commit certain types of material

fraud against the United States government.[1]  To enforce the provisions of the False Claims Act, the Attorney General may sue a violator in a civil lawsuit pursuant to § 3730(a), or a private plaintiff, known as a relator, may bring a *qui tam* civil action in the name of the United States against a violator pursuant to § 3730(b).[2]  "In a *qui tam* action, the relator pursues the government's claim against the defendant, and asserts the injury in fact suffered by the government. [ ] In bringing a *qui tam* action, the relator in effect, sues as a partial assignee of the United States."  <u>United States ex rel. Hunt v. Cochise Consultancy, Inc.</u>, 887 F.3d 1081, 1086 (11th Cir. 2018), <u>aff'd</u>, 139 S. Ct. 1507 (2019)(citations and internal quotations omitted). The FCA places a number of restrictions on suits by relators and establishes specific procedures a relator must follow in filing the complaint, <u>State Farm Fire & Casualty Co. v. United States</u>, 137 S. Ct. 436, 440 (2016), discussed below.

On or about June 3, 2010 Edward Sanders (Sanders), a sole practitioner licensed to practice law in Mississippi, was retained

---

[1] <u>Universal Health Servs. Inc. v. United States ex rel. Escobar</u>, 136 S. Ct. 1989, 2003 (2016)(FCA is not an "all purpose anit-fraud statute" and is not "a vehicle for punishing garden-variety breaches of contract or regulatory violations.")

[2]"*Qui tam* is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur,* which means 'who pursues this action on our Lord the King's behalf as well as his own.'" <u>Vt. Agency of Nat. Res. v. United States ex rel. Stevens</u>, 529 U.S. 765, 768 n.1 (2000).

by Bradley Nurkin (relator or Nurkin) to prepare and file a FCA lawsuit. Nurkin was the former Chief Executive Officer of Charlotte Regional Medical Center (CRMC), one of a chain of hospitals owned by Health Management Associates, Inc. (HMA).

On January 13, 2011, Nurkin and Sanders executed a Contract For Legal Services (the contingent fee Contract) (Doc. #13-3) in which Nurkin agreed to pay Sanders one-third of "whatever recovery I ultimately receive from this litigation." Nurkin also agreed that all out-of-pocket expenses directly incurred by Sanders would be paid out of the Nurkin's recovery proceeds before calculation of the attorney fee. Id. The Contract also recited that if the United States Attorney did not agree to intervene in the lawsuit, Nurkin did not want the case to proceed. Id.

On January 14, 2011 Sanders filed Nurkin's sealed *qui tam* Complaint (Doc. #1) in the Fort Myers Division of the Middle District of Florida against Health Management Associates, Inc., Charlotte HMS, LLC, and Punta Gorda HMA, LLC (collectively defendants) for violation of the FCA. The Complaint alleged that defendants knowingly induced doctors to make patient referrals and hospital admissions by intentionally and knowingly providing the doctors with improper remuneration; intentionally and knowingly submitted false certifications of compliance; and intentionally and knowingly submitted false claim forms. This misconduct was intended to cheat the United States out of $100-$150 million. The

Court granted Nurkin's accompanying Motion to Seal (Doc. #35) and stayed the case except for service of the Complaint and statutory disclosures upon the government.  (Doc. #36.)

> Special procedures apply when a relator brings an FCA action; these procedures afford the government the opportunity to intervene and assume primary control over the litigation. A relator who initiates an FCA action must file her complaint under seal and serve it only on the United States. 31 U.S.C. § 3730(b)(2). While the lawsuit remains under seal, the United States has the opportunity to investigate and decide whether to intervene as a party. Id. During this period, the United States may serve a civil investigative demand upon any person believed to be in possession of documents or information relevant to an investigation of false claims, requiring that person to produce documents, answer interrogatories, or give oral testimony. Id. § 3733(a)(1). In addition, the United States may meet with the relator and her attorney, giving the government an opportunity to ask questions to assess the strengths and weaknesses of the case and the relator a chance to assist the government's investigation.
>
> If the United States decides to intervene, the government acquires "primary responsibility for prosecuting the action," although the relator remains a party. Id. § 3730(c)(1). In contrast, if the United States declines to intervene, the relator may proceed with the action alone on behalf of the government, but the United States is not a party to the action. Id. § 3730(c)(3).

Cochise Consultancy, Inc., 887 F.3d at 1086–87.

As it turned out, the United States spent almost three years deciding whether to intervene in Nurkin's case.  The primary

activity in the court file during this time was multiple unopposed requests by the government for extensions of time to decide whether to intervene and several matters relating to the sealing or unsealing of the Complaint. (Docs. ##37-60.)

On December 16, 2013, the United States filed its Notice of Election to Intervene. (Doc. #2.)   The Government advised the Court that it intended to file a motion renewing its request to the Judicial Panel on Multidistrict Litigation (the MDL Panel) that the MDL Panel transfer most of the other *qui tam* cases against HMA, including this case, to a single district.   (Id.)   The government also sought a stay of the proceedings pending a ruling by the MDL Panel.   (Id.)   The Government's request for stay was granted on December 19, 2013, and the Complaint was unsealed. (Doc. #3.)[3]

On January 15, 2014, the United States filed Notice of its second motion seeking transfer of the case to the MDL Panel. (Doc. #6.) On April 10, 2014, the MDL Panel transferred this case, and seven others, to the District of the District of Columbia for centralized handling. (Doc. #7.) The allegations in six of the transferred cases concerned the improper admissions of patients through the Emergency Departments of hospitals without medical necessity, while the seventh case alleged wrongdoing in connection

---

[3]On January 8, 2021, the Court unsealed the remainder of the court file. (Doc. #34.)

with a joint venture arrangement with a physician's group at HMA hospitals in Pennsylvania.

Shortly after the cases arrived at the MDL Court, the MDL parties moved for and obtained a stay of proceedings in order to pursue settlement discussions.  As it turned out, settlement discussions occurred over the next four years, with periodic requests to extend the stay in the case being granted by the assigned MDL judge.

Sanders asserts that on or about May 9, 2017, the government and defendants agreed to the amount to be paid to the government by defendants in the Nurkin matter. (Doc. #13-5, ¶ 40.)  On February 1, 2018, Sanders filed an unopposed motion for extension of time in which to file motion for attorneys' fees, costs, and expenses (Doc. #9-2, pp. 9-11)[4], which was granted.  Sanders asserts that on or about March 22, 2018 Nurkin's share of the government's recovery was agreed upon.  (Doc. #13-5, ¶ 41.)

In late September 2018, a settlement was announced, and in October 2018, a global settlement was formalized between the Department of Justice and defendants in all eight cases.  None of the relators in the eight cases, including Nurkin and his counsel, had participated in these settlement negotiations.  Among other things, HMA agreed to pay the United States $262.2 million to

---

[4] All page numbers in the document citations refer to the CM/ECF-generated numbers at the upper right corner of the document.

resolve all civil and criminal matters, including the eight *qui tam* lawsuits. The global settlement allocated $93.5 million of that amount to Nurkin's case, which was to be dismissed.

>Any recovery obtained from a defendant in an FCA qui tam action belongs to the United States, regardless of whether the government has intervened. The relator is entitled to a portion of the recovery, however. <u>Id.</u> § 3730(d). . . .
>
>The size of the relator's share depends upon whether the United States intervenes. In an intervened case, the relator usually is entitled to between 15 and 25 percent of the proceeds, as well as reasonable expenses, attorney's fees, and costs. 31 U.S.C. § 3730(d)(1). In a non-intervened case, the relator's share usually is greater: between 25 and 30 percent of the proceeds, as well as reasonable expenses, attorney's fees, and costs. Id. § 3730(d)(2).
>
>Even though the relator receives a smaller share in an intervened case, relators generally try to persuade the United States to intervene because the government's intervention makes it far more likely that there will be a recovery. When the United States elects to intervene, about 90 percent of the time the case generates a recovery, either through settlement or a final judgment. But only about 10 percent of non-intervened cases result in recovery. <u>See</u> David Freeman Engstrom, Public Regulation of Private Enforcement: Empirical Analysis of DOJ Oversight of Qui Tam Litigation Under the False Claims Act, 107 Nw. U. L. Rev. 1689, 1720-21 (2013). Indeed, when the government declines to intervene, more than 50 percent of the time the relator decides not to proceed and voluntarily dismisses the action. <u>See id.</u> at 1717-18.

<u>Cochise Consultancy, Inc.</u>, 887 F.3d at 1087–88 (footnote omitted).

On October 22, 2018, a Joint Stipulation of Dismissal (Doc. #9-2, pp. 1-4) was signed by Sanders and the other parties, agreeing to dismissal of Nurkin's case pursuant to the Settlement Agreement.  On October 25, 2018, an Order (Doc. #9-2, pp. 7-8) was entered dismissing Nurkin's FCA case, but retaining jurisdiction over any claim by Nurkin for expenses, attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d).

On an unspecified date Nurkin received $14,952,913 of the $93.5 million allocated to his case (approximately 16%) from the government.  (Doc. #13, p. 4.)  HMA did not dispute that Nurkin was entitled to attorneys' fees pursuant to the FCA (Doc. #9-2, p. 40), and for much of 2019 Nurkin and HMA attempted to resolve their disagreement over the amount of attorneys' fees HMA owed to Nurkin. (Id. at 41.)  These efforts were unsuccessful.

On November 12, 2019, HMA filed a Motion To Suggest Remand (Doc. #9-2, pp. 39-43) of the case back to the Middle District of Florida to resolve the only remaining issue – the amount of attorney fees, expenses, and costs.  The government agreed to the motion, but Nurkin filed a written opposition.  (Doc. #9-2, pp. 48-55.)

On April 2, 2020, the MDL Panel issued a Conditional Remand Order (Doc. #9) remanding this case because the pretrial proceedings had been completed.  Attached was a copy of the Order signed October 25, 2018, dismissing Nurkin's FCA claim except for

the request for attorneys' fees, expenses and costs, which was remanded to this Court.  (Doc. #9-2, pp. 7-81.)

## II.

The Supreme Court has stated that "a request for attorney's fees should not result in a second major litigation." <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 437 (1983).  That ship sailed long ago in this case.

Pursuant to the contingent fee Contract with Sanders, Nurkin paid his attorneys approximately $4,934,461.29 - one-third of the amount Nurkin received from the government.  The "American Rule" is a bedrock principle under which "[e]ach litigant pays his own attorney fees, win or lose, unless a statute or contract provides otherwise."  <u>Peter v. Nantkwest, Inc.</u>, 140 S. Ct. 365, 370 (2019)(citation omitted).  A court does not deviate from the American Rule "absent explicit statutory authority."  <u>Baker Botts LLP v. ASARCO LLC</u>, 576 U.S. 121, 126 (2015)(citation omitted). Nurkin now seeks attorney fees under the fee-shifting provision of the FCA.[5]

Under the FCA, in addition to a shared recovery of the funds obtained by the government, a *qui tam* relator "shall also receive

---

[5] As discussed in § IV-B(5) of this Opinion and Order, it is not entirely clear whether Nurkin seeks reimbursement of the attorney fees he has paid from his recovery, or simply wants his attorneys to receive additional fees, paid by defendants, or some combination of both.

an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant." 31 U.S.C. § 3730(d).[6] Nurkin asks the Court to award such attorney fees in one of the following amounts using one of the following three methodologies:

> Lodestar: $4,128,983.70
>
> Enhanced Loadstar: $9,207,633.65
>
> Contingency Fee: $11,921,250.00

(Doc. #13, p. 13.)

Defendants ask the Court to either deny the fee request entirely or award only a small fraction of the request. (Doc. #24, pp. 4, 7-22.) Defendants suggest total attorney fees of $229,544.70. (Id. at 31.)

### III.

The Court first addresses defendants' request to eliminate all shifted fees as a sanction. The Court recognizes its inherent authority, which includes fee shifting and, the Court believes, fee reduction or elimination.

---

[6] "There are over 100 separate statutes providing for the award of attorney's fees; and although these provisions cover a wide variety of contexts and causes of action, the benchmark for the awards under nearly all of these statutes is that the attorney's fee must be 'reasonable.'" Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 562 (1986), supplemented, 483 U.S. 711 (1987).

Federal courts possess certain "inherent powers," not conferred by rule or statute, "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." <u>Link v. Wabash R. Co.,</u> 370 U.S. 626, 630–631, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962). That authority includes "the ability to fashion an appropriate sanction for conduct which abuses the judicial process." <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 44–45, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991). And one permissible sanction is an "assessment of attorney's fees"—an order, like the one issued here, instructing a party that has acted in bad faith to reimburse legal fees and costs incurred by the other side. <u>Id.</u>, at 45, 111 S. Ct. 2123.

This Court has made clear that such a sanction, when imposed pursuant to civil procedures, must be compensatory rather than punitive in nature. <u>See Mine Workers v. Bagwell</u>, 512 U.S. 821, 826–830, 114 S. Ct. 2552, 129 L. Ed. 2d 642 (1994) (distinguishing compensatory from punitive sanctions and specifying the procedures needed to impose each kind). In other words, the fee award may go no further than to redress the wronged party "for losses sustained"; it may not impose an additional amount as punishment for the sanctioned party's misbehavior. <u>Id.</u>, at 829, 114 S. Ct. 2552 (quoting <u>United States v. Mine Workers</u>, 330 U.S. 258, 304, 67 S. Ct. 677, 91 L. Ed. 884 (1947)). To level that kind of separate penalty, a court would need to provide procedural guarantees applicable in criminal cases, such as a "beyond a reasonable doubt" standard of proof. <u>See id.</u>, at 826, 832–834, 838–839, 114 S. Ct. 2552. When (as in this case) those criminal-type protections are missing, a court's shifting of fees is limited to reimbursing the victim.

<u>Goodyear Tire & Rubber Co. v. Haeger</u>, 137 S. Ct. 1178, 1186 (2017)(footnote omitted).  The key to the imposition of sanctions

under a court's inherent authority is a finding of subjective bad faith.  Hyde v. Irish, 962 F.3d 1306, 1310 (11th Cir. 2020).

The misconduct alleged by defendants in this case relates to the contents of the fee request, which defendants criticize as constituting "rampant overbilling" which is "grossly excessive" and/or "outright fictitious".  (Doc. #24, pp. 7, 9, 20.)  The Court, however, finds an insufficient basis to reduce or eliminate attorney fees as a sanction.  While plaintiff's fee records were clearly not contemporaneously prepared, the Court does not find subjective bad faith by plaintiff or his counsel.  The normal rules for reviewing requests to shift attorney fees, expenses, and costs provide the Court with sufficient control to achieve an orderly and expeditious disposition of the case and the motion.[7]  Thus, while the Court will make reductions to the requested attorney fees and expenses, it will not do so as a sanction under its inherent authority.

**IV.**

Generally, courts calculate attorney fees using one of two methods – the percentage method or the lodestar method, with or without a lodestar multiplier (enhancement).  In re Home Depot Inc., 931 F.3d 1065, 1076 (11th Cir. 2019).  The Court discusses

---

[7] For example, "[w]here the documentation of hours is inadequate, the district court may reduce the award accordingly." Hensley, 461 U.S. at 434.

each methodology and the appropriate amount of reasonable attorney fees.

## A. Percentage Methodology

Nurkin argues that the Court should use a contingency fee methodology because the lodestar method does not "adequately model the risk taken by counsel" that the government would not intervene. The contingency fee method, on the other hand, "accurately compensates counsel for the risk undertaken and also considers the spectacular results obtained for the United States." (Doc. #13, pp. 11-12.)

Nurkin's expert William Henry Shawn (Mr. Shawn) favors this methodology over either lodestar approaches. (Doc. #13-1, pp. 12, 18-19.) Mr. Shawn asserts that Nurkin is entitled to a percentage of the net recovery by the government, i.e. a percentage of all the money recovered by the government allocated to the Nurkin case ($93.5 million) less the amount paid to Nurkin ($14,952,913). Utilizing $79,475,000 as the net amount recovered by the government, Mr. Shawn asserts Nurkin is entitled to his contractual 33.33 percent contingency, but nonetheless reduces the percentage to 15%. Mr. Shawn then computes 15% of the net recovery obtained by the United States, arriving at "a fair and reasonable full contingency fee of $11,921,250.00." (Id. at 19.)

Nurkin and Sanders utilized a contingency fee arrangement under which the attorney fees were to be paid by Nurkin from his

recovery (if he obtained one).  Such an arrangement, however, cannot be utilized where the fees are being awarded pursuant to a fee-shifting statute under which a non-client will be paying the fees. "In statutory fee-shifting cases, the Supreme Court has said that courts should use the lodestar method."  In re Home Depot Inc., 931 F.3d at 1081 (citing City of Burlington v. Dague, 505 U.S. 557, 562 (1992)).  See also Blanchard v. Bergeron, 489 U.S. 87, 96 (1989)("The contingent-fee model, premised on the award to an attorney of an amount representing a percentage of the damages, is thus inappropriate for the determination of fees under § 1988.") Rather, the lodestar methodology is used to determine the amount of a reasonable attorney fee under the FCA.

> The FCA permits a relator "reasonable attorney's fees and costs." 31 U.S.C. § 3730(d)(1) (2006). The district court calculates attorney's fees under the lodestar formula, which is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley v. Eckerhart, 461 U.S. 424, 103 S. Ct. 1933, 1939, 76 L. Ed. 2d 40 (1983); Norman v. Housing Auth. of the City of Montgomery, 836 F.2d 1292, 1299 (11th Cir.1988) (citing Hensley).

United States v. Patrol Servs., Inc., 202 F. App'x 357, 358-59 (11th Cir. 2006).  There is no convincing legal basis which supports applying a contingency percentage to an amount awarded to a party other than the client - here the United States, which was represented by its own attorneys.

Even if available in a FCA case, the contingency fee as determined by Mr. Shawn would be grossly excessive.  Nurkin asserts that his attorneys worked 4,618.55 hours on his case.  As a result, the contingency fee requested by Mr. Shawn is the functional equivalent of approximately $2,581.00 an hour for each hour expended, not counting almost $5 million (approximately $1,068 per hour) already paid to Nurkin's attorneys.

Accordingly, the Court declines to utilize a percentage method to determine the amount of reasonable attorney fees in this FCA case.

### B.  Lodestar and Enhanced Lodestar Methodology

"The amount of the fee, of course, must be determined on the facts of each case."  Hensley, 461 U.S. at 429.  Under the lodestar methodology, the trial court makes "an initial estimate of reasonable attorney's fees by applying prevailing billing rates to the hours reasonably expended on successful claims."  Bergeron, 489 U.S. at 87 (citing Hensley, 461 U.S. at 433). See also Norman v. Housing Authority of City of Montgomery, 836 F.2d 1292, 1299 (11th Cir. 1988).  "[T]he lodestar method produces an award that roughly approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case."  Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 551 (2010)(emphasis in original).

While the lodestar approach is "the centerpiece of attorney's fee awards," Blanchard, 489 U.S. at 94, "[t]he courts may then adjust this lodestar calculation by other factors." Id. The so-called Johnson factors[8] "may be relevant in adjusting the lodestar amount, but no one factor is a substitute for multiplying reasonable billing rates by a reasonable estimation of the number of hours expended." Id. The Supreme Court has rejected undue reliance on the 12-factor test. Murphy v. Smith, 138 S. Ct. 784, 790 (2018). Adjustments to the lodestar result may only be awarded in "rare" and "exceptional" circumstances. Perdue, 559 U.S. at 552 (citations omitted). The Supreme Court has consistently rejected enhancing a lodestar calculation based on risk, highly favorable results, novelty and complexity of the issues, special skill and experience of counsel, and quality of representation. Delaware Valley Citizens' Council for Clean Air, 478 U.S. at 564-65; Dague, 505 U.S. at 566; Perdue, 559 U.S. at 554.

---

[8]The twelve Johnson factors are:  (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. Johnson v. Georgia Highway Exp., Inc., 488 F.2d 714, 717-719 (5th Cir. 1974).

The existence of a contingent fee Contract between Nurkin and Sanders, however, does not change the lodestar methodology. "We have never suggested that a different approach is to be followed in cases where the prevailing party and his (or her) attorney have executed a contingent-fee agreement." Blanchard, 489 U.S. at 94. A "reasonable attorney's fee"

> contemplates reasonable compensation, in light of all of the circumstances, for the time and effort expended by the attorney for the prevailing plaintiff, no more and no less. Should a fee agreement provide less than a reasonable fee calculated in this manner, the defendant should nevertheless be required to pay the higher amount. The defendant is not, however, required to pay the amount called for in a contingent-fee contract if it is more than a reasonable fee calculated in the usual way.

Blanchard, 489 U.S. at 93. "The attorney's fee provided for in a contingent-fee agreement is not a ceiling upon the fees recoverable under § 1988." Id. at 96.

Nurkin computes the lodestar amount as follows: A reasonable hourly rate of $894 per hour multiplied by 4,618.55 reasonable hours for a fee total of $4,128,983.70. (Doc. #13, p. 10.) Nurkin uses a multiplier of 2.23 to arrive at an enhanced lodestar amount of $9,207,633.45. (Id. pp. 10-11.)

Defendants object to almost everything involved with this proposed attorney fee calculation. Defendants assert that the lodestar amount should be $229,544.70. (Doc. #24, p. 31.)

- 17 -

### (1)  Reasonable Hourly Rate

Relator seeks an hourly rate of $894 for each of his three attorneys. (Doc. #13, p. 6.)  Defendants' expert A. Brian Albritton (Mr. Albritton) recommends an hourly rate of $400 for Sanders when engaged in non-associate type of legal work, $300-$350 for Branning when performing partner-level work, and $250 for all of Johnson's work.  (Doc. #24-1, pp. 16-17.)[9]

"A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." Norman, 836 F.2d at 1299 (citations omitted).

> The general rule is that the 'relevant market' for purposes of determining the reasonable hourly rate for an attorney's services is 'the place where the case is filed.'  If a fee applicant desires to recover the non-local rates of an attorney who is not from the place in which the case was filed, he must show a lack of attorneys practicing in that place who are willing and able to handle his claims.

Am. Civil Liberties Union of Georgia v. Barnes, 168 F.3d 423, 437 (11th Cir. 1999) (citing Cullens v. Georgia Dep't of Transp., 29 F.3d 1489, 1494 (11th Cir. 1994)).  The burden is on the fee applicant "to produce satisfactory evidence" that the rate is in line with those prevailing in the relevant legal community.  Blum

---

[9] In his Reply, the Relator suggests that $400 would be the appropriate rate for all his attorneys if the Court concludes that Fort Myers is the prevailing market.  (Doc. #26, p. 2 n.2.)

v. Stenson, 465 U.S. 886, 896 n.11 (1984).  "Satisfactory evidence," means "more than the affidavit of the attorney performing the work." Loranger v. Stierheim, 10 F.3d 776, 781 (11th Cir. 1994)(citation omitted).  A court "is itself an expert on the question and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value." Id. (citation omitted).

Relator asserts that the relevant market is the District of Columbia, where the case was transferred and settled, and that the District of Columbia reasonable hourly rate for all three of his attorneys is $894.  (Doc. #13, pp. 5-6.)  The Relator relies upon Mr. Shawn's expert opinion as to the hourly rates in the District of Columbia, which the Court would accept, however the District of Columbia is not the relevant legal community.

The case was filed in the Fort Myers Division of the Middle District of Florida after Nurkin's attorneys specifically researched the proper venue for the case.  (See Doc. # 24-1, p. 11, n.13.)  The facts underlying plaintiff's claim clearly support venue in the Fort Myers Division.  The great majority of the work by attorneys Sanders and Branning occurred prior to the transfer of the case to the District of Columbia.  The extensive activities in the District of Columbia occurred when the case was controlled by government attorneys, who reached the global settlement with

HMA without participation of relator or his attorneys.  Relator has not attempted to establish the unavailability of FCA-qualified counsel in either Fort Myers or the Middle District of Florida. The Court concludes that the Fort Myers Division of the Middle District of Florida is the relevant legal community for purposes of determining the reasonable hourly rates for an attorney's services in this FCA case.

The record contains relatively little background concerning plaintiff's attorneys.  The Declaration of Edward Sanders (Doc. #13-5) shows that Sanders is a 1990 graduate of the University of Mississippi School of Law, and the managing partner (and sole member) of Sanders Law.  Mr. Sanders has 28 years of litigation experience with a focus that appears to be product liability cases, as well as involvement in mass tort, consumer finance, personal injury, class action, antitrust, medical malpractice, and insurance cases.  (Id., ¶¶ 2, 3, 5.)  Sanders has no documented experience in FCA cases prior to his representation of Nurkin, although defendants acknowledge that he "had successfully litigated complex product liability and other tort actions." (Doc. #24, p. 4.)

Robert Joseph Branning (Branning) is, according to defendants, a 1996 graduate of the Mississippi College School of Law who was admitted to The Florida Bar in December, 1999. Branning was appointed as a Lee County, Florida, Circuit Court

Judge in 2014. (Doc. #24-1, pp. 8-9.)   Prior to his appointment to the bench, Branning was a partner at a small Fort Myers law firm which focused on criminal defense.   Branning has no documented experience in FCA cases prior to his representation of Nurkin.   Branning is well-known to the Court, having tried at least one federal criminal case before the undersigned.

Bethany Brantley Johnson (Johnson) was hired by Sanders to assist in the preparation of an application for attorney fees, expenses and costs.   Ms. Johnson is a 1996 *summa cum* laude graduate of the Mississippi College School of Law and is licensed to practice law in Mississippi.   Defendants report that a Google search reflects that Johnson is currently with a law firm in Mississippi and concentrates her practice in the areas of the Fair Labor Standards Act, the Employment Retirement Income Security Act, and employment litigation.  (Doc. #24-1, p. 9.)

None of relator's attorneys specify what their actual hourly rates were at the time or are currently.[10]   There is no evidence of hourly rates in prior attorney fees awarded to any of the attorneys.[11]   Relator has presented no evidence as to the hourly rates in the Middle District of Florida.   Defendants have cited

---

[10] What an attorney charges clients "is powerful, and perhaps the best, evidence of his market rate."   Dillard v. City of Greensboro, 213 F.3d 1347, 1354-55 (11th Cir. 2000).

[11] Although relevant, this factor would not be entitled to controlling weight.   Dillard, 213 F.3d at 1355.

to several awards by the undersigned to other attorneys (Doc. #24, pp. 25-26), and offered the opinion of an expert witness.  The Court is itself considered an expert with regard to local hourly attorney rates.

The Court finds that a rate of $400 an hour is appropriate for Sanders and Branning, while $300 an hour is an appropriate rate for Johnson.  One exception will be applied: preparation of the attorney fee application hours will be reduced to $300 an hour for all counsel.  The Court declines defendants' invitation to reduce the hourly rate for Sanders and Branning when they were performing work a large law firm would normally assign to an associate.  Sanders is a sole practitioner, and Branning was with a very small law firm.  As long as each was performing legal work (as opposed to, for example, clerical functions), each will be awarded the hourly rate set forth above.  Any adjustments needed because of the less challenging nature of some of the legal work will be accounted for in the number of hours allowed, not the hourly rate.

**(2)  Reasonable Number of Hours**

In determining the reasonable number of hours, the Court may conduct an hour-by-hour analysis or it may reduce the requested hours across the board, but not both.  Bivins v. Wrap It Up, Inc., 548 F.3d 1348, 1350 (11th Cir. 2008).  The Court must eliminate excessive, unnecessary, and redundant hours, and those which were

not reasonably expended.  *Hensley*, 461 U.S. at 434; *Norman*, 836 F.2d at 1301-02.  "Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority."  *Hensley*, 461 U.S. at 434 (citation omitted).  *See* *also* *In re Home Depot, Inc.*, 936 F.3d at 1087 ("Time spent is reasonable, and thus compensable, if it would be proper to charge the time to a client.")  Conversely, there are hours which are not reasonably billed to the adversary but are compensable from the client.  *Dillard v. City of Greensboro*, 213 F.3d 1347, 1356 (11th Cir. 2000) ("The retrospective futility of work does not per se make it non-compensable. But it does cast doubt on the reasonableness of requiring the other side to pay for it.")  Thus, a relator must show that the hours are both compensable and may properly be shifted to the opposing party.

Relator asserts that the reasonable number of hours expended by his attorneys from June 3, 2010 through April 23, 2019 is a total of 4,618.55 hours, with the following annual breakdown:

| Year | Hours |
|---|---|
| 2010 | 1,272.50 |
| 2011 | 1,054.45 |
| 2012 | 316.60 |
| 2013 | 379.50 |
| 2014 | 396.30 |
| 2015 | 253.80 |
| 2016 | 230.90 |
| 2017 | 216.80 |
| 2018 | 344.40 |
| 2019 | 153.30 |
| **Total** | 4,618.55 |

(Doc. #13, p. 9; Doc. #13-4, pp. 1-96.)   According to relator's Division of Labor chart (Doc. #13-8), the hours attributed to each attorney are as follows:

| Attorney | Total Hours |
|----------|-------------|
| Mr. Sanders | 3771.35 |
| Mr. Branning | 479.8 |
| Ms. Johnson | 368.2 |
| **TOTAL** | 4619.35[12] |

Relator seeks a lodestar attorney fee based upon the 4,618.55 hours.

   As the party opposing the fee application, defendants have "an obligation to identify the hours that should be excluded with some degree of specificity."   Rodriguez v. Molena Healthcare, Inc., 806 F. App'x 797, 804 (11th Cir. 2020)(citation omitted). Defendants argue that the requested hours are "grossly excessive" and "wildly inflated," that many entries "appear to be outright fictitious," and that a number of the hours cannot be shifted as a matter of law.   (Doc. #24, pp. 7, 9, 17.)   More specifically, defendants challenge as unnecessary and unreasonable many of the hours leading to the filing of the Complaint, the hours spent preparing the attorney fee petition, the hours spent communicating with Nurkin, the hours spent checking PACER, and the hours spent

---

[12] The total from the Division of Labor chart is slightly higher than the relator's requested total of 4,618.55 hours because the hours for 2018 in that chart are .8 hour more than from the billing records summarized in relator's prior chart at Doc. #13, p. 9.   The Court will use the 4,618.55 hours requested by relator.

checking the current stock price of defendant HMA. Defendants challenge as fictitious the time entries relating to talking/texting with Nurkin regarding updates, the stock checking and PACER entries, and the hours spent at the Joshua Putter criminal trial. Finally, defendants assert that, as a matter of law, certain hours may not be recovered under a fee-shifting statute, including time spent getting "up to speed" on the FCA, time spent on the criminal case of Joshua Putter and convincing the government that Nurkin had no criminal liability, time spent negotiating Nurkin's recovery share from the government, and travel time from Mississippi to Florida and elsewhere. Defendants recommend that a total of 750 hours be allowed. (Doc. #24-14, p. 2.) Defendants have submitted various charts collecting the hours they believe should be disallowed. (Doc. #24-3 to Doc. #24-13.)

The Court finds it useful to examine the number of hours in mostly chronological segments based upon the status of the case at the time: (a) hours spent prior to the filing of the Complaint; (b) hours spent after the Complaint was filed but prior to intervention by the United States; (c) hours spent after the government's intervention through the settlement; and (d) hours spent working on the application for attorney fees, expenses, and costs. The procedural posture of the case helps the evaluation of the necessity and reasonableness of the hours expended.

**(a)  Pre-Complaint Hours**

The FCA, like many fee-shifting federal statutes, allows for recovery of attorney hours reasonably expended on the litigation. This includes some attorney services performed prior to the filing of a complaint.  "Of course, some of the services performed before a lawsuit is formally commenced by the filing of a complaint are performed 'on the litigation.' Most obvious examples are the drafting of the initial pleadings and the work associated with the development of the theory of the case."  Webb v. Bd. of Educ. of Dyer County, Tenn., 471 U.S. 234, 243 (1985).

Nurkin claims a total of 1,441.55 hours (1,272.5 hours in 2010 and 169.05 hours in 2011) were worked by his attorneys in the 31 weeks between June 3, 2010 (when Nurkin spoke with Sanders about bringing a claim against his former employer) and January 13, 2011 (the day before the Complaint was filed).  (Doc. #13, p. 9; Doc. #13-4, pp. 2-13.)  Sanders explains that during this time period he met and corresponded extensively with Nurkin in order to fully understand the "complexity, nature, and severity of the fraud" and to draft a complaint which would withstand legal challenges both as to drafting sufficiency and Rule 11 sanctions.  (Doc. #13-5, ¶¶ 21-26.)

Defendants assert that these hours were "grossly excessive" and "wildly inflated," and that no more than 300 hours should have been spent on this stage of the case.  (Doc. #24, pp. 9-10.)  Using

defendants' Index of Exhibits (Doc. #24-3) as an outline of the bases for contesting the hours, the Court determines that during this pre-Complaint time period the following contested hours in the following categories will be allowed:

| Defendant Exhibit # | Description | Contested Hours | Hours Allowed |
|---|---|---|---|
| 1 | Communications with Client | 197.5 | 197.5 |
| 2 | Analyze Stock Prices | 0.4 | 0.4 |
| 3 | "T/c and text with client re: updates/status | None[13] | None |
| 4 | Text re Ethics Rule | None | None |
| 5 | Check PACER | None | None |
| 6 | Putter Trial | None | None |
| 7 | Basic Qui Tam Research | 763.3[14] | 200.0 |
| 8 | Criminal Matters | None | None |
| 9 | Relator's Share | 7.4[15] | 0.0 |
| 10 | Travel to/from Florida | 15.5 | 0.0 |
| | **Total** | 984.1 | 397.9 |

Defendants have objected to 197.5 hours spent communicating with Nurkin prior to the filing of the Complaint as being unreasonable. (Doc. #24-4, pp. 2-6.) After reviewing each time

---

[13] The reference to "none" in this chart indicates there were no hours attributed to the described conduct during this time period.

[14] The total hours in this category is actually 770.7 hours on defendants' chart (Doc. #24-10), but this total includes the 7.4 hours also contained in the Relator's Share category (Doc. #24-12). To avoid double counting, the Court has considered the hours without the Relator's Share category hours included.

[15] In Nurkin's Reply (Doc. # 26, p. 9, n. 9), he states that Relator's Share hours were included in the fee application in error, and withdraws his request for those hours. The Court will therefore disallow those hours in all time periods.

entry and the Sanders Declaration, the Court finds that these hours were necessary and reasonable given the nature of the contemplated cause of action and the underlying facts, and the need to adequately develop a viable theory of the case.  Nurkin, of course, was the primary source of the needed information at this stage of the proceedings.

Checking defendants' stock price once at the beginning of the case was both reasonable and *de minimis*.  The Court will allow the 0.4 hours.

The 7.4 hours relating to Relator's Share will be disallowed for reasons set forth in footnote 15.

Defendants object to 763.3 hours billed to researching *qui tam* matters during this period as being excessive.  (Doc. #24-10, pp. 2-9.)  Defendants' Exhibit 7 (Doc. #24-10) collects the time entries in which Sanders and/or Branning billed for researching basic legal principles of *qui tam* actions, which defendants maintain should not be awarded against an opposing party.  (Doc. #24, p. 18.) The Court agrees that most of these research hours, even if compensable, may not be shifted to the opposing party.

The FCA certainly has unique aspects not found in many federal statutes.  The time entries establish, however, that the research concerning the FCA, the federal pleading requirements, and Rule 11 was far more than what an experienced attorney (such as both Sanders or Branning) would have reasonably needed to provide

competent service in the pre-Complaint stage of this case. Counsel's research started at the ground floor (researching the "FCA and how it works" and its elements), and simply went way overboard. While Nurkins argues that the time spent on research "was necessitated by HMA's conduct," doc. #26, p. 4, this is clearly not true for this time period, before the Complaint was even filed. The Court will allow 200 hours as a reasonable number of hours for pre-Complaint *qui tam* research in a case of this magnitude, and disallow the remaining 563.3 hours.

The 15.5 hours of travel time during this time period was for Sanders to travel to Fort Myers to speak with Nurkin and Branning and to file the Complaint. The Court will disallow all 15.5 hours. Sanders had obtained local counsel in Fort Myers, and there has been no showing of a need for Sanders to travel to Fort Myers to file the Complaint or consult with his client or co-counsel.

In sum, plaintiff asserts his attorneys expended 1,441.55 hours during this time period (June 2, 2010 through January 13, 2011). Defendants objected to 984.1 of these hours, and therefore 457.45 hours were not specifically contested (1,441.55 hours minus 984.1 hours).[16]   The Court overrules defendants' objections as

---

[16] Defendants do argue that generally the uncontested hours should be reduced by 74.5% in order to arrive at Mr. Albritton's opinion that "probably substantially less" than 1,000 total hours should have been expended in this case. (Doc. #24-14.) The Court declines to do so.

discussed above and will allow an additional 397.9 hours   Thus, the Court will allow a total of 855.35 hours during this 31-week period (roughly 27 hours per week) to be included in the fee-shifting under the FCA.

| Hours Claimed | 1,441.55 |
| Uncontested Hours Allowed | 457.45 |
| Contested Hours Allowed | 397.9 |
| Total Hours Allowed | 855.35 |

**(b)   After Complaint But Before Government Intervention**

Between filing the Complaint on January 14, 2011, and intervention by the United States on December 16, 2013, Nurkin claims his attorneys expended 1,577 additional hours on the case. Counsel expended 885.4 hours in 2011 after the Complaint was filed; 316.60 hours in 2012; and 375 hours in 2013 before the government's intervention.  (Doc. #13-4, pp. 32, 44, 55.) According to Sanders, during this time period,

> Nurkin and his counsel began working extensively with United States Attorneys and federal investigators in Florida and Washington, D.C. to explain and demonstrate the complex web of improper conduct HMA had spun in order to steal from the United States. Nurkin's counsel outlined to the authorities the huge amount of money this fraud was costing the United States taxpayers.

(Doc. #13, pp. 3-4.)   See also Doc. #13-5, ¶¶ 34-36.  Sanders asserts that in 2011 and 2012, he spent many hours assisting government agencies with the examination of hundreds of thousands

of pages of documents, doc. #13-5, ¶ 29, and in 2013 he continued to assist the government to review documents, id. at ¶ 30.

Defendants object to over half of the 1,577 hours for various reasons. Again, using defendants' Index of Exhibits (Doc. #24-3) as an outline of the bases for contesting the hours, the Court determines that during this post-Complaint, pre-intervention time period the following contested hours in the following categories will be allowed:

| Defendant Exhibit # | Description | Contested Hours | Hours Allowed |
|---|---|---|---|
| 1 | Communications with Client | 406.7[17] | 351.7 |
| 2 | Analyze Stock Prices | 5.6 | 0.0 |
| 3 | "T/c and text with client re: updates/ status | None[18] | None |
| 4 | Text per Ethics Rule | 6.3 | 0.0 |
| 5 | Check PACER | None | None |
| 6 | Putter Trial | None | None |
| 7 | Basic Qui Tam Research | 190.8 | 36 |
| 8 | Criminal Matter Re: Nurkin (Not Putter) | 235.2 | 0.0 |
| 9 | Relator's Share | 53.6 | 0.0[19] |
| 10 | Travel to/from Florida | 26.35 | 10.0 |
| | **Total** | 924.55 | 397.7 |

---

[17] The total hours in this category is actually 487.1 hours on defendants' chart (Doc. #24-4), but this also includes 6.3 hours for Ethics Rule texts, 4.4 share hours, and 69.7 hours duplicated in the criminal matter hours. In order to avoid double-counting, the Court has considered the communication hours without these hours included.

[18] See footnote 13.

[19] See footnote 15.

Defendants object to 5.6 hours during which Sanders analyzed the HMA stock prices for the stated purpose of assessing HMA's ability to pay any future award and conveyed his assessment to Nurkin. (Doc. #24-5, p. 2.)  Sanders consistently billed .4 hour to periodically analyze the stock prices for HMA, doing so on fourteen occasions during this time period.  (<u>Id.</u>)  The Court finds that all of these hours were unnecessary to Nurkin's FCA case, and cannot be shifted to the opposing party.  The Court will disallow the 5.6 hours.

Defendants challenge 6.3 hours in which Sanders asserts he was texting his client "per Ethics Rule 1.4."  (Doc. #24-7, p. 2.) Defendants point out that all nineteen texts were on a Saturday, and all but one was for .3 hour.  (Doc. #24, p. 14 n.16.)  "Ethics Rule 1.4" is apparently a reference to an attorney's obligation to keep a client reasonably informed about a matter, although neither side identifies an actual Rule.   The billing records amply demonstrate multiple communications keeping Nurkin reasonably well informed about the case, even when it was stayed and very little was going on.  The Court finds that these texts were unnecessary and cannot be shifted to the opposing party.  The Court will disallow 6.3 hours.

During the course of deciding whether to intervene in Nurkin's *qui tam* case, the government began to see the potential for criminal prosecutions, including Nurkin and Joshua Putter.  A

criminal investigation of Nurkin was begun by the U.S. Attorney's Office in Fort Myers.  This investigation did not conclude until shortly before the government decided to intervene in Nurkin's *qui tam* case.  Defendants object to 235.2 hours spent in connection with Nurkin's defense of the government's criminal investigation. (Doc. #24-11, pp. 2-4; Doc. #24, pp 18-19.)

There is no question that Nurkin was entitled to be represented by counsel in connection with the government's criminal investigation, and that the hours expended by Sanders were compensable.  The hours expended defending the criminal investigation of Nurkin may not, however, be shifted to a defendant in the *qui tam* action.  "Time expended independent of the relevant federal litigation is not compensable."  Loranger, 10 F.3d at 782. Like Title VII of the Civil Rights Act, the FCA does not envision reimbursement for legal work done in criminal cases.  Mayson v. Pierce, 806 F.2d 1556, 1558 (11th Cir. 1987).  Accordingly, the Court will disallow all 235.2 hours expended in connection with the potential criminal prosecution of Nurkin.

The Relator's Share 53.6 hours will be disallowed for reasons set forth in footnote 15.

Defendants object to 26.35 hours for travel to and from Florida during this time period (Doc. #24-13, p. 2) because competent FCA attorneys were available in Florida.  (Doc. #20, p. 20.)  The Court disallows the 3.75 travel hours on January 14,

2011 because, as stated in the pre-Complaint discussion, there was no need for Sanders to travel to Florida. The Court allows the 10.0 hours in March 2011 to meet with the AUSA in Tampa concerning the *qui tam* investigation. The meeting was clearly in furtherance of the underlying *qui* tam action and Sanders' presence was necessary. The Court disallows the 6.5 travel hours on October 9, 2013, because it involved activities in connection with the defense of Nurkin in the criminal investigation. The Court disallows the 6.1 travel hours on October 24-25, 2013 because it involved meeting with the AUSA conducting the criminal investigation of Nurkin. In sum, the Court disallows 16.35 hours and allows 10.0 hours of the travel in this period of time.

Defendants object to 190.8 hours of additional *qui tam* research during this time period. (Doc. #24-10, pp. 9-11.) The Complaint had been sealed and not served on defendants, and the case was stayed, but Sanders decided to work on the *qui tam* case just in case the government did not intervene. (Doc. #13-5, ¶ 28.)[20] Sanders researched discovery procedures if the government did not intervene (28.7 hours), potential discovery issues, requests for discovery, and prepared for asserting privileges (79.1 hours) as well as the consolidation with similar cases and

---

[20] This was despite the notation in the contingent fee Contract that Nurkin did not want the case to proceed if the government did not intervene.

first to file issues (32.8 hours).   (Doc. #24-10, pp. 9-11.)
Additionally, Sanders researched various criminal issues
(approximately 47 hours), such as the crime-fraud exception to the
attorney client privilege and considerations in testifying before
a grand jury in Boston.   The Court finds that the civil hours
expended for discovery research to have been unnecessary and, in
the end, wasted activity, and finds the hours related to the
criminal investigation are not properly shifted to defendants.
The Court disallows 154.8 hours, and allows the remaining
miscellaneous hours (3.2 hours) and 32.8 of the hours expended to
determine the impact of consolidation and the "first to file"
issue, for a total of 36 hours for additional *qui tam* research.

Finally, defendants object to 406.7 of the hours the attorneys
spent communicating with Nurkin during this time period.   (Doc.
#24-4, pp. 6-18.)  Of these hours, the Court finds that 55 hours
relating to development of a discovery plan, work on
interrogatories and initial disclosures, and preparation of an
outline in the event of no intervention were excessive and
unnecessary.   The rest of the hours relate to normal activities
between Nurkin and his attorneys as the government proceeds with
Nurkin's case and the other MDL cases.   The Court will therefore
allow 351.7 hours.

In sum, plaintiff asserts his attorneys worked for 1,577 hours
during this time period (January 14, 2011 through December 16,

2013).   Defendants objected to 924.55 of these hours, and therefore 652.45 hours were not specifically contested (1,577 hours minus 924.55).[21]  The Court sustains defendants' objections to 526.85 of the contested hours.  Therefore, the Court will allow 397.7 hours (plus the 652.45 uncontested hours) for a total of 1,050.15 hours to be included in the fee-shifting under the FCA. For the 152 weeks in this time period, this equates to about 7 hours per week attributable to the *qui tam* action.

| Hours Claimed | 1,577 |
|---|---|
| Uncontested Hours Allowed | 652.45 |
| Contested Hours Allowed | 397.7 |
| Total Hours Allowed | 1,050.15 |

**(c)  After Government Intervention (Excluding Attorney Fee Application)**

The government intervened on December 16, 2013, and the case was remanded to Fort Myers on April 2, 2020 after settlement. Between December 16, 2013 through April 23, 2019 (the end of relator's submitted billing records) Nurkin's attorneys expended 1,601.4 additional hours, which includes 457.8 hours attributed to preparation of the attorney fee application.  The Court addresses the hours not related to the preparation of the attorney fee application (1,143.6 hours) in this section.  Sanders represents that during this time period he and Nurkin continued their extensive assistance to the government as it prosecuted HMA

---

[21] See footnote 16.

officers and negotiated the share of recovery Nurkin would receive. (Doc. #13-5, ¶¶ 31, 35-42.)[22]

Defendants object to a large number of these hours for various reasons. Again, using defendants' Index of Exhibits (Doc. #24-3) as an outline of the bases for contesting hours, the Court determines that during this post—intervention time period the following contested hours in the following categories will be allowed:

| Defendant Exhibit # | Description | Contested Hours | Hours Allowed |
|---|---|---|---|
| 1 | Communications with Client | 111.5[23] | 111.5 |
| 2 | Analyze Stock Prices | 7.2 | 0.0 |
| 3 | "T/c and text with client re: updates/ status | 338.6 | 18.8 |
| 4 | Text per Ethics Rule | None[24] | None |
| 5 | Check PACER | 18.9 | 4.2 |
| 6 | Putter Trial | 47.5 | 0.0 |
| 7 | Basic Qui Tam Research | 104.8 | 104.8 |
| 8 | Criminal Matter Re: Putter | 244.7 | 0.0 |

---

[22] The Court suspects that plaintiff's expert misspoke as to the last portion of the sentence in his report which stated that "the record is clear Sanders Law's efforts did not cease and were not needed once the government assumed primary responsibility for prosecuting Relator Nurkin's case." (Doc. #13-1, p. 15.)

[23] The total amount of hours for this time period is actually 552.7 on defendant's chart (Doc. #24-4). However, included in these hours are the same 338.6 text hours, 32.1 of share hours, and 70.5 hours attributable to the criminal matter (not Putter) and also the Putter trial listed in other charts. In order to avoid double-counting, the Court has considered the communication hours without these hours included.

[24] See footnote 13.

| 9 | Relator's Share | 57.2 | 0.0[25] |
| 10 | Travel to/from Florida | 6.8 | 0.0 |
| | **Total** | 937.2 | 239.3 |

Defendants object to the 7.2 hours in which Sanders analyzed the stock prices for HMA to see if a judgment against HMA would be collectable. (Doc. #24-5, p. 2.) As stated previously, the Court finds that these hours were unnecessary and cannot be shifted to the opposing party. The Court will disallow 7.2 hours.

Defendants object to 188 entries, totaling 338.6 hours, beginning January 4, 2015 and stating "T/C's and texts with client re: updates/status." (Doc. #24-6.) There are no further descriptions of the nature or content of the communications. While defendants doubt that many of these actually occurred, they also argue that the time is excessive. (Doc. #24, pp. 13-15.) The Court assumes that the contacts did occur, but finds that there is nothing in the billing records or Declarations which would justify more than the usual .1 hour for a routine update to a client about a case which has been stayed. This is especially so in light of the vast number of hours otherwise attributed to communication with Nurkin. Therefore, the Court allows 18.8 hours, and disallows 319.8 hours.

Defendants object to 18.9 hours spent by Sanders checking PACER reports during this time period. (Doc. #24-8.) These

---

[25] See footnote 15.

occurred monthly from September 2014 through December 2015, and then again from January 2017 through April 2017.   These checks of PACER reports were "to ascertain existence of any new filings; compare and contrast with existing filings and notify client of developments."   There was very little activity in terms of the court file, and the .9 hour per event is excessive.   The Court reduces this time to .2 hour per activity, and will allow 4.2 hours and disallow 14.7 hours.

In this time period, the criminal aspects of the government's investigation had moved away from Nurkin and focused on Joshua Putter.   Sanders states that during 2014, he and Nurkin began assisting the government with the preparation for the Putter trial. (Doc. #13-5, ¶ 31.)   Sanders asserts that in 2014, 2015, and 2016 there were numerous calls and letters with regard to the criminal investigation, and Nurkin's likely testimony in the Putter trial. (Id., ¶ 37.)

Two categories of defendants' objections relate to the Putter criminal investigation and trial.   First, Sanders expended 47.5 hours in October 2014 to attend five days of Putter's federal criminal trial in Fort Myers, Florida.   Each of his five time entries read: "Attend Putter trial; post-trial meetings with Nurkin to discuss updates and progress of trial," and each billed 9.5 hours.   (Doc. #24-9.)   Second, Sanders expended a total of

244.7 hours concerning Putter-related criminal matters, including the 47.5 hours Sanders spent at the Putter trial.  (Doc. #24-11.)

On October 3, 2013, Joshua S. Putter was named in a one-count Indictment (Case No. 2:13-cr-141-JES-CM, Doc. #3).  On December 18, 2013, a Superseding Indictment (id., Doc. #18) charged that on October 7, 2008, Putter did knowingly falsify or make a false entry in a letter to the Chief Executive Officer of C.R.M.C. with the intent to impede, obstruct, or influence the investigation and proper administration of any matter within the jurisdiction of the United States Department of Health and Human Services, Office of Inspector General.  A copy of the offending letter was provided in a Bill of Particulars.  (Id. at Doc. #41.)  Nurkin was named as one of 61 witnesses in the government's Witness List (id. at Doc. #79), but was not called as a witness at the trial.  After a twelve-day jury trial before the undersigned, Putter was found not guilty on November 13, 2014.  (Id. at Doc. #113.)

Defendants argue that none of this time is compensable because Putter's criminal trial did not advance the civil case against HMA, and Putter was not charged with an FCA violation.  Further, Putter was acquitted and Nurkin was never called as a witness. (Doc. #24, pp. 18-19.)  Although the verdict is not attributable to Nurkin, "[t]ime expended independent of the relevant federal litigation is not compensable" Loranger, 10 F.3d at 782, and a typical fee-shifting statute such as the FCA does not envision

reimbursement for legal work done in criminal cases.  Mayson, 806 F.2d at 1558.  The court disallows all 244.7 hours (which includes within it the 47.5 hours of trial attendance) as being improper to shift to the FCA defendant.

Defendants object to 104.8 hours of *qui tam* research conducted during this time period.  (Doc. #24-10, pp. 11-12.)  These hours related to specific *qui tam* issues that had arisen.  Many of these hours overlap with other categories, including attorney fees, relators share, which are already disallowed, and the "criminal aspect" of the civil case.  Upon review, the Court declines to disallow other hours.

Defendants object to 6.8 hours for travel to and from Florida in connection with the Putter trial. (Doc. #24-13.)  Since time spent in connection with the criminal investigation of Putter may not be shifted to the opposing party, the Court disallows these 6.8 hours.

Defendants have objected to 111.5 hours of billed time involving communications between Nurkin and his attorneys.  (Doc. #24-4, pp. 19-29.)  The duplicated hours were disallowed from other categories, e.g., criminal matters, Putter investigation and trial, share hours.  The Court declines to disallow other hours.

In sum, plaintiff asserts his attorneys worked for 1,601.4 hours during this time period (December 16, 2013 through April 23, 2019).  Defendants objected to 937.2 of these hours, and therefore

206.4 hours were not specifically contested (1,143.6 hours minus 937.2).[26]  The Court sustains defendants' objections to 697.9 of the contested hours.  Therefore, the Court will allow 239.3 hours to be included in the fee-shifting under the FCA.

| Hours Claimed | 1,143.6 |
|---|---|
| Uncontested Hours Allowed | 206.4 |
| Contested Hours Allowed | 239.3 |
| Total Hours Allowed | 445.7 |

**(d) Hours Related to Attorney Fees, Expenses, Costs Motion**

Nurkin also seeks attorney fees for the time his attorneys expended on preparation of the attorney fee application motion and supporting documents.  (Doc. #13, pp. 12-13.)  Defendants do not object to the principle that "fees for fees" are recoverable, but do object to the number of hours and amount sought.

"Like other courts, we have allowed parties to recover the cost of establishing their right to, and the amount of attorney's fees—the right to fees-on-fees." Norelus v. Denny's, Inc., 628 F.3d 1270, 1301 (11th Cir. 2010).  The Court concludes that this principle applies to the fee-shifting statute contained in the FCA, and Nurkin is entitled to recover reasonable attorneys fees for time expended on the preparation of the fee application and supporting documents.

Nurkin asserts that his attorneys spent 457.8 hours preparing the fee application and supporting documents in 2017, 2018, and

---

[26] See footnote 16.

2019.  (Doc. #13-6, p. 2.)[27]  Using the combined information from two of Nurkin's charts results in the following breakdown of hours relating to the preparation of the attorney fee application:

| Year | Sanders | Johnson | Total |
|------|---------|---------|-------|
| 2017 | 27.0 | 80.4 | 107.4 |
| 2018 | 11.5 | 185.6 | 197.1 |
| 2019 | 51.1 | 102.2 | 153.3 |
| Total | 89.6 | 368.2 | 457.8 |

(Doc. #13-6, p. 2; Doc. #13-8, pp. 2-3.)  Thus, at the $300 per hour rate the Court has found reasonable for this type of task, Nurkin seeks $137,340 to prepare the attorney fee application and supporting documents.

Sanders started working on the fee application on May 15, 2017 (Doc. #24-10, p. 12), but soon realized he needed the help of another attorney and retained Johnson in August 2017.  (Doc. #13-4, p. 84; Doc. #13-5, ¶¶ 43, 45.)  Sanders states that Johnson's "engagement was necessary and required for me to appropriately prepare a complete and accurate 8-year bill record to submit for recovery, as outlined in the FCA."  (Id.)  It is clear that Johnson was not reviewing contemporaneous billing records, but was creating billing records from numerous documents provided by Sanders.  The result was that this process took a grossly excessive amount of time.

---

[27] In his Memorandum, Nurkin stated he would "detail this time in a subsequent filing with this Court once fully realized."  (Doc. #13, p. 13.)  Nothing has been filed in the subsequent nine months.

Prior to filing the *qui tam* action, Sanders conducted over 16 hours of research regarding the availability of attorney fees under the FCA.  (Doc. #24-10, pp. 3-4.)  Sanders must have encountered cases addressing the lodestar and its calculation and the importance of contemporaneous recordkeeping.  Despite this, Sanders did not keep contemporaneous records sufficient to establish the number of hours he expended and the tasks performed. The Court finds that it cannot shift the resulting inefficiency to defendants.  In the Court's view, the reasonable amount of time to prepare the attorney fee application and supporting documents in this case with adequate records would have been approximately 40 hours.  The Court allows 40 hours and disallows the remainder of the time as excessive.

**(3)  Lodestar Fee Adjustment and Multiplier**

"[T]here is a 'strong presumption' that the lodestar figure is reasonable, but that presumption may be overcome in those rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee."  Perdue, 559 U.S. at 553-54.  See also Murphy, 138 S. Ct. at 789.  "To warrant a multiplier, the fee applicant must produce "specific evidence" that an enhancement is necessary to provide a reasonable fee."  In re Home Depot Inc., 931 F.3d 1065, 1082 (11th Cir. 2019) (citing Perdue, at 553).

The Court finds that the lodestar calculation takes into account all factors which may be properly considered in this case for determination of a reasonable attorney fee.  Neither a fee adjustment nor use of a multiplier is warranted in this case.

**(4)   Interest on Attorney Fees**

Nurkin seeks interest on the attorney fees to be paid by HMA "from the date Nurkin became a successful relator."  (Doc. #13, p. 13.)  This apparently occurred on October 22, 2018, when Sanders signed the Joint Stipulation of Dismissal.  (Doc. #13-5, ¶ 33.) Neither side provides any law for the imposition of pre-judgment interest on an attorney fee award under a federal fee-shifting statute.

Florida law requires the imposition of prejudgment interest on an award of attorney fees.  Quality Engineered Installation, Inc. v. Higley S., Inc., 670 So. 2d 929, 931 (Fla. 1996).  Since the claim in this case was not based on Florida law, however, this line of cases is not controlling.  As a magistrate judge in the Southern District of Florida recently stated, "[t]he undersigned could find no federal authority for awarding prejudgment interest on attorneys' fees."  Ortiz v. Sch. Bd. of Broward County, Florida, 18-60209-CIV, 2020 WL 1361486, at *4 (S.D. Fla. Jan. 13, 2020), report and recommendation approved, 18-60209-CIV, 2020 WL 4926581 (S.D. Fla. Apr. 24, 2020).  The Court declines to award pre-

judgment interest on the attorney fees (or expenses and costs) awarded in this case.

**(5)  Who Gets the Money?**

While the fee motion and its Memorandum and Reply are not clear on the issue, it appears that Nurkin believes that any of the attorney fees, costs, or expenses belong to Sanders, in addition to what Sanders has received pursuant to the contingent fee Contract.  This is certainly the way defendants read relator's papers.  (Doc. #24, p. 30 n.32.)  In this case, however, that view is incorrect.

To be sure, there are situations when an attorney is entitled to the amount agreed upon in a contingent fee agreement *plus* the amount awarded pursuant to a fee-shifting statute.  For example, a relator may prevail, but the recovery is so humble that the resulting percentage does not result in a reasonable attorney fee. In such a situation, counsel would be entitled to some or all of the shifted attorney fees in order to accomplish a reasonable attorney fee.  Thus, the Supreme Court has held that a contingent fee agreement does not impose a ceiling of the recovery of an attorney fee.  <u>Blanchard</u>, 489 U.S. at 93-94.

This is not one of those situations.  By all accounts, the recovery made by the government attributable to Nurkin's case was excellent.  The resulting dollar amount of Nurkin's share was substantial enough to result in a contingent attorney fee which

was ample and did not need to be supplemented to arrive at a
"reasonable" amount.   Therefore, the amount awarded as shifted
attorney fees, expenses, and costs belong to Nurkin.

Both Sanders and Nurkin have stated that the contingency fee
Contract assigned any recovery of attorney fees to Sanders.  (Doc.
#13-5, ¶ 20; Doc. #13-5, p. 16.)   This is clearly incorrect.
Nothing in that Contract (Doc. #13-3) assigns attorney fees to
Sanders or any one else.   Nurkin filed a Declaration stating he
"hereby assigns" the attorney fees to Sanders, and that he has
acquired other obligations to Sanders.  (Doc. #13-5.)   Nothing in
the Declaration suggests that the "hereby assigns" language
creates a binding assignment.   If Nurkin owes Sanders fees for
services not encompassed by the FCA representation, then obviously
he may use any of his resources, including these awarded fees, to
pay his obligations.   However, this award of attorney fees does
not belong to Sanders, but to Nurkin, as the relator.   See 31
U.S.C. § 3730(d) ("Any payment to a [*qui tam* plaintiff[28]] shall be
made from the proceeds. Any such person shall also receive an
amount for reasonable expenses which the court finds to have been
necessarily incurred, plus reasonable attorneys' fees and
costs.").

---

[28]"Section 3730(b) allows a private plaintiff, known as a
relator, to bring a *qui tam* action in the name of the United States
against a violator."   Cochise, 887 F.3d at 1086.

In the exercise of its discretion based on the reasonable hourly rates and reasonable number of hours discussed above, the Court awards attorney's fees totaling $952,480.

| Time Period | Total Hours Claimed | Total Hours Allowed | Total Fees |
|---|---|---|---|
| Pre-Complaint ($400/h) | 1,441.55 | 855.35 | $342,140 |
| Post Complaint, Pre-Intervention ($400/h) | 1,577.0 | 1,050.15 | $420,060 |
| Post Intervention ($400/h) | 1,143.6 | 445.7 | $178,280 |
| Attorney Fee Application ($300/h) | 457.8 | 40 | $12,000 |
| **Total** | **4,619.95** | **2,391.2** | **$952,480** |

**V.**

The Relator also seeks to recover costs and expenses of $14,730.30. (Doc. #13-5, ¶ 47; Doc. #13-12, pp. 2-3.) Defendants suggest that reasonable expenses are $6,869.70. (Doc. #24-15, Exh. 12.) Defendants' view is more generous than the Court's, so the Court will award the amount agreed-to by defendants.

Relator seeks $360 as reimbursement of the filing fee. The Court will allow $350 for the filing fee[29] and $13.00 for certified mail as taxable costs under 28 U.S.C. § 1920(1).

Relator seeks travel expenses of $1,068.48 for a January 14, 2011 for a trip to Fort Myers to file the Complaint. The Court

---

[29] Counsel requests $360 for the filing fee, but the filing fee in 2011 was only $350.

previously found this trip unnecessary, and declines to allow these as reasonable expenses.

Relator seeks reimbursement of $2,449.77 expenses for a March 15, 2011, trip in which Sanders flew to Tampa for a relator interview with an AUSA concerning the *qui tam* action.  The Court will allow this travel expense, with one exception.  Without receipts or an explanation, the Court finds that over $500 for meals for a one-day trip based on the billing records (Doc. #13-4, p. 19) is excessive.  The Court will allow the airfare, lodging, car rental, parking, meals of $150, for a total of $2,086.77.

On October 27, 2011, Sanders flew to D.C. to meet with the Department of Justice, Health and Human Services, and the Federal Bureau of Investigations for an interview of Nurkin.  Sanders returned to Mississippi on October 29, 2011.  (Doc. #13-4, p. 30.) The Court will reduce the meals to $300, and otherwise allow the expenses.   The Court will allow a total of $1,870.00.

Nurkin seeks expenses of $1,269.38 for Sanders' travel on July 25, 2012, to Boston for grand jury proceedings, and to prepare Nurkin's testimony.  Sanders returned on July 29, 2012.  (Doc. #13-4, p. 42.)  These proceedings were presumably related to Nurkin's potential testimony in the Joshua Putter case, or at least some criminal case, the travel was unrelated to the advancement of the FCA civil case.  The Court will not allow these expenses.

Nurkin seeks expenses of $1,056.07 for Sanders' travel on October 9, 2013, to Florida to consult with Peter Ringsmuth and Ms. Burby as Nurkin's criminal defense attorneys, and returned the same day. (Doc. #13-4, p. 53.) The Court will disallow these expenses relating to potential criminal charges.

Nurkin seeks expenses of $1,620.67 for Sanders' travel on October 23, 2013, to Atlanta and Fort Myers for a meeting with Nurkin and Ms. Burby. Sanders also attended a meeting with DOJ, and returned to Mississippi on October 25, 2013. Since these meetings appear to be concerning criminal matters, the Court will disallow all these expenses.

The Court will not allow the October 26, 2014, expenses of $1,645.61 for travel to Fort Myers for Putter's trial. Not only was there a local attorney for the civil case, but Nurkin also had criminal counsel locally and Nurkin did not testify.

Therefore, the Court will allow $363 in taxable costs, plus expenses of $6,869.70, as suggested by defendants, for a total of $7,232.70 in costs and expenses.

Accordingly, it is hereby

**ORDERED:**

The Relator's Motion for Award of Attorney Fees, Costs, and Expenses (Doc. #12) is **GRANTED in part.** Bradley Nurkin is awarded $952,480 in attorney fees, $363 in taxable costs, and $6,869.70 in expenses against defendants Health Management Associates, Inc.,

Charlotte HMS, LLC and Punta Gorda HMA, LLC, jointly and severally.

The Clerk shall enter judgment in favor of relator and against

defendants accordingly.

     **DONE and ORDERED** at Fort Myers, Florida, this   8th   day of

February, 2021.

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Counsel of Record